Fortune J. WILLIAMS,
M.D., Appellant,

v.

COMMONWEALTH OF KENTUCKY,
Appellee.

No. 2003–SC–0319–MR.

Supreme Court of Kentucky.

Nov. 22, 2006.

Rehearing Denied Feb. 22, 2007.

Margaret Foley Case, Department of Public Advocacy, Frankfort, for Appellant.

Gregory D. Stumbo, Attorney General, Jeffrey A. Cross, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, for Appellee.

Opinion of the Court by Justice GRAVES.

A Lewis Circuit Court jury convicted Appellant, Fortune J. Williams, M.D., of four counts of unlawfully prescribing a controlled substance in violation of KRS § 218A.1404(3). For these crimes, Appellant was sentenced to twenty (20) years imprisonment. Appellant now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). For the reasons set forth herein, we reverse Appellant's convictions and remand this case for a new trial.

In 2001, the Lewis County Sheriff's Office began receiving complaints about traffic problems at Dr. Williams' medical clinic

in Lewis County. Upon further investigation, the sheriff's office confirmed that a large number of out-of-state vehicles were parked in the clinic's lot and that people were loitering in and about the clinic. The sheriff's office further determined that numerous persons emerging from the clinic appeared to be under the influence of intoxicants and thus, began making arrests of those persons for driving under the influence. At this point, the sheriff's office contacted the Attorney General who in turn contacted the Office of Drug Control with the Cabinet for Health and Family Services. Ron Burgess from the Attorney General's Office and Bob Kelly from the Office of Drug Control were directed to immediately initiate a joint investigation.

On January 24, 2001, Mr. Kelly requested and received a report from the Kentucky All–Schedule Prescription Electronic Reporting (KASPER) System concerning the type and quantity of drugs being prescribed by Appellant. The report revealed that Appellant was prescribing large quantities of multiple controlled substances to several patients. The activity was suspicious because several of these patients were between the ages of twenty-five (25) and thirty-five (35), and it appeared as if they were filling the prescriptions two or three times a month.

After reviewing the KASPER reports and the information from the sheriff's office, Mr. Burgess and Mr. Kelly jointly set up a sting operation. They sent three informants to pose as new patients at Dr. Williams' clinic. The informants testified that they went to the clinic complaining of various ailments. The informants gave information and fake medical records to nurses. When they finally saw Dr. Williams, he spent three to fifteen minutes with each of them before prescribing controlled substances. At no time did Dr. Williams perform a physical examination of any of the informants. On follow-up visits, Dr. Williams simply asked the informants whether anything had changed from the last visit before renewing each of the informants' prescriptions.

In July 2001, upon conclusion of the sting operation, Mr. Burgess filed a grievance with the Kentucky Board of Medical Licensure, which then became involved with the investigation. The Board's investigator, Eric Tout, asked Mr. Burgess and Mr. Kelly to prepare a list of patients that "they felt the Medical Board needed to look at." A list of thirty-five (35) patients was prepared by Mr. Burgess and Mr. Kelly and transmitted to Mr. Tout. At that point, Mr. Tout testified that he believed that he had authority, pursuant to former KRS § 311.605(2)[1], to conduct a warrantless raid on Dr. Williams' clinic for the purpose of seizing these patients' files and collecting any other evidence that may have pertinence to the investigation. On September 26, 2001, Mr. Tout, Mr. Burgess, Mr. Kelly, and several agents from both the Lewis County sheriff's office and the state police conducted a warrantless raid on Dr. Williams' clinic.[2] During the raid, patient files and other evidence were seized. This evidence revealed that Appellant was seeing approximately 100 to 150 patients per day and prescribing large quantities of controlled substances. The

---

1. Prior to July 12, 2006, former KRS § 311.605(2) gave agents of the Board of Medical Licensure "power and authority to administer oaths, to enter upon premises at all times for the purpose of making inspections, to seize evidence, including but not limited to psychiatric or nonpsychiatric records, to interrogate all persons, and to require the production of books, papers, documents, or other evidence."

2. Curiously, members of the media were also present for the raid.

evidence also disclosed that nurses had most all contact with patients, even to the point of pre-printing prescriptions for Appellant's signature. Evidence from both the raid and the investigation previously conducted by Mr. Burgess and Mr. Kelly was admitted against Appellant at trial.

Appellant was convicted by jury of four counts of unlawfully prescribing a controlled substance in violation of KRS 218A.1404(3). Appellant alleges several errors which entitle him to a new trial. For the reasons set forth herein, we are compelled to reverse Appellant's convictions.

## I.

■ Appellant first alleges that his Fourth Amendment rights were violated when several law enforcement agencies, acting in concert, conducted a warrantless raid on his clinic. "The Court long has recognized that the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes." *New York v. Burger*, 482 U.S. 691, 699, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). Just like private residences, a search of commercial premises is "presumptively unreasonable if conducted without a warrant." *See v. City of Seattle*, 387 U.S. 541, 543, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); *see also, Marshall v. Barlow's, Inc.*, 436 U.S.

307, 311, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).

■ The Commonwealth contends that the warrantless raid in this case was permissible pursuant to the exception set forth in *Burger, supra.* In *Burger, supra,* the United States Supreme Court held that a warrant was not required for "administrative inspections" of "commercial property employed in 'closely regulated' industries." *Id.* at 700, 107 S.Ct. at 2642. However, in order to proceed forward with a *Burger* analysis, we must make two initial findings: (1) that the medical profession is a "closely regulated industry," and (2) that this search was conducted for administrative, rather than law enforcement, purposes. *Id.* at 700–702, 107 S.Ct. at 2642–44; *see also, Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) ("Although we usually require that a search be undertaken only pursuant to a warrant ..., we have permitted exceptions when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.")(internal quotations and citations omitted).

Even if we were to presume that the medical profession is a "closely regulated industry" for the purposes of conducting warrantless searches of private physicians' offices and medical files,[3] the Common-

---

**3.** The answer to this query is by no means clear. On the one hand, it is apparent that the medical profession is one of the most pervasively regulated industries in the Commonwealth. *See, e.g.,* KRS § 311.555 ("It is the declared policy of the General Assembly of Kentucky that the practice of medicine and osteopathy should be regulated and controlled ... in order to prevent empiricism and to protect the health and safety of the public."); KRS § 311.560 (prohibiting the practice of medicine or osteopathy without a license); KRS § 311.565 (establishing Board of Medical Licensure's power to "[p]romulgate reasonable administrative regulations establish-

ing moral, physical, intellectual, educational, scientific, technical, and professional qualifications of applicants for licenses"); KRS § 218A.202 (establishing electronic database to monitor and record the dispensation of certain controlled substances by practitioners and pharmacists within the Commonwealth); KRS § 215.590 (cases of active tuberculosis must be reported to state authorities); KRS § 620.030 (duty to report suspected child abuse or neglect); KRS § 258.065 (duty to report animal bites to state authorities); 902 KAR 2:020 (duty to report an array of ail-

wealth has failed to make any credible showing that the search in this case was conducted for an administrative rather than law enforcement purpose. Accordingly, the *Burger* exception is not applicable.

The seminal case regarding this issue is *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). In *Ferguson*, a state hospital, in conjunction with law enforcement, set up a program where the hospital drug tested pregnant women's urine (presumably, without their consent) whenever hospital personnel suspected that the pregnant women were using illicit substances. *Id.* at 71, 121 S.Ct. at 1285. When tests came back positive, the pregnant women were given a choice—go to drug treatment or have the results turned over to police. *Id.*

The *Ferguson* Court stated that in order for the hospital's warrantless search program to qualify as being "administrative" or "special needs" in nature, its immediate purpose must be "divorced from the State's general interest in law enforcement." *Id.* at 79, 121 S.Ct. at 1289. The hospital argued that its warrantless drug testing program did satisfy such a guideline since its ultimate goal was to protect the health and welfare of both mothers and their unborn children by curtailing the

use of illegal substances during pregnancy. *Id.* at 70, 121 S.Ct. at 1284. However, the Supreme Court cited two factors which ultimately undermined the hospital's position: (1) the evidence was not inadvertently acquired in the course of routine treatment, but was obtained *"for the specific purpose of incriminating those patients,"* and (2) there was excessive entanglement with law enforcement in both the development and application of the drug testing policy. *Id.* at 85–86, 121 S.Ct. at 1292–93 (emphasis in the original). These two factors, the Court held, were too inextricably entwined with an immediate law enforcement purpose to justify the warrantless search as being "administrative" or "special needs" in nature.

■ In this case, the Commonwealth asserts that the warrantless search was a valid administrative inspection conducted pursuant to former KRS § 311.605(2) for the primary purpose of investigating an administrative grievance filed with the Board of Medical Licensure. However, just like in *Ferguson, supra,* two factors ultimately undermine the Commonwealth's position: (1) the raid in this case was conducted for the immediate and sole purpose of collecting incriminating evidence against Appellant; and (2) there was excessive entanglement with law enforcement in both the Board's investigation of

---

ments, including HIV, syphilis, plague, and gonorrhea).

On the other hand, it also seems self-evident that some degree of privacy exists in the procurement of health care. *See Thacker v. Commonwealth*, 80 S.W.3d 451, 454 (Ky.App. 2002) (reasonable expectation of privacy in medical records); *Health Insurance Portability and Accountability Act (HIPAA) Privacy Rules*, codified at 45 C.F.R. parts 160 and 164 (use and disclosure of protected health information generally prohibited except as permitted within confines of the Act); *Ferguson v. City of Charleston*, 532 U.S. 67, 78, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001)("The reasonable expectation of privacy enjoyed by the

typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent."); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 550 (9th Cir. 2004)("all provision of medical services in private physician's offices carries with it a high expectation of privacy for both physician and patient"); *see also*, Ralph Ruebner & Leslie Ann Reis, *Hippocrates To HIPAA: A Foundation for a Federal Physician–Patient Privilege*, 77 Temp. L.Rev. 505 (Fall 2004) (arguing that public policy has emerged to favor increased confidentiality in and privacy of patient health information).

Appellant and in the resulting warrantless raid at his office.

■ While we agree with the Commonwealth that "[t]he discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal or the administrative scheme suspect," *Burger, supra,* at 716, 107 S.Ct. at 2651, warrantless inspections do become unconstitutional when both the administrative agency's investigation and resulting search are inextricably entwined with law enforcement personnel and law enforcement objectives.[4] As Justice Kennedy stated in his concurring opinion in *Ferguson, supra,* "the active use of law enforcement, including arrest and prosecutions, as an integral part of a program which seeks to achieve legitimate, civil objectives" is not sustainable under the Fourth Amendment. *Id.* at 88, 121 S.Ct. at 1294 (Kennedy, J., concurring).

In this case, an active criminal law enforcement investigation had been ongoing for six months prior to the engagement of the administrative agency in this case. The Board of Medical Licensure did not initiate a civil investigation into the matter until a formal grievance was filed by the criminal investigators. When the Board's investigation proceeded, it was in complete conjunction with the uninterrupted criminal investigation. Indeed, not only did the criminal investigators supply the Board with all underlying facts and evidence to support its investigation, but the criminal investigators also determined which files were to be seized by the Board and then accompanied and assisted the Board during the actual raid.[5] Such excessive entanglement with law enforcement simply belies any notion that the warrantless raid in this case was somehow "divorced from the State's general interest in law enforcement." *Ferguson, supra,* at 79, 121 S.Ct. at 1289; *see also, New Jersey v. T.L.O.,* 469 U.S. 325, 341, n. 7, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (distinguishing searches carried out by administrative authorities "acting alone and on their own authority" from those conducted "in conjunction with or at the behest of law enforcement agencies").

Moreover, in determining when a warrant requirement is unsuitable in any particular circumstance, the U.S. Supreme Court has always analyzed whether "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *O'Connor v. Ortega,* 480 U.S. 709, 720, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (quoting *Camara v. Municipal Court,* 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967)). In *Burger, supra,* the Supreme Court found that obtaining a warrant for each administrative inspection in that case was not practical "because stolen cars and parts often pass

---

4. Generally, the subjective motivations of individual state actors are irrelevant when considering whether a search or seizure is reasonable under the Fourth Amendment. However, the U.S. Supreme Court has recognized special needs and administrative search cases to be an exception to this rule. *Compare United States v. Knights,* 534 U.S. 112, 122, 122 S.Ct. 587, 593, 151 L.Ed.2d 497 (2001) *with Indianapolis v. Edmond,* 531 U.S. 32, 45, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) *and Ferguson, supra,* at 79, 121 S.Ct. at 1289.

5. We completely reject the Commonwealth's specious argument that the presence of four different state agencies was necessary to ensure security during the warrantless raid. While it is reasonable to conclude that the Lewis County sheriff's office or even the state police were necessary to protect the personal safety of Mr. Tout, the agent from the Board of Medical Licensure, it is not reasonable or even plausible to conclude that investigative agents from the Attorney General's office and the Office of Drug Control were also necessary to accomplish this task.

quickly through an automobile junkyard," and thus, the delay involved in obtaining a warrant would likely frustrate the regulatory purpose. *Id.* at 710, 107 S.Ct. at 1493–94. In contrast, a warrant requirement was imposed upon regulatory inspections conducted by the Occupational Safety and Health Administration (OSHA) in *Marshall v. Barlow's, Inc., supra,* since requiring a warrant in that situation would not "impose serious burdens on the inspection system or the courts, [would not] prevent inspections necessary to enforce the statute, or [would not] make then less effective." *Id.* at 316, 98 S.Ct. at 1822. With the evidence available before the raid, we perceive absolutely no reason whatsoever (and the Commonwealth identifies none) why the miniscule delay in obtaining a warrant would have frustrated the governmental purpose of any of the authorities in this case.[6]

█ When the foregoing circumstances are considered and balanced in their totality, we are unable to sustain the warrantless raid of Appellant's office under any type of "special needs" or *Burger* excep-

tion to the warrant requirement. In plain words, neither Section 10 of Kentucky's Constitution nor the Fourth Amendment permits administrative statutes or agencies to be utilized or exploited as a means to conduct searches and seizures for law enforcement purposes without first obtaining (1) consent; or (2) a valid warrant. Accordingly, the evidence seized during the raid must be excluded as being obtained in violation of Appellant's Fourth Amendment rights.

In light of our holding that former KRS § 311.605(2) was unconstitutionally applied in this case, we need not address Appellant's argument that the former statute was facially unconstitutional even if it was constitutionally applied.

We also reject the Commonwealth's argument that *Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) should be applied to save the evidence collected during the raid from being suppressed at trial. Any reliance on former KRS § 311.605(2) was simply unreasonable in light of the excessive and unauthorized entanglement with law enforcement[7]

**6.** Indeed, effective July 12, 2006, KRS 311.605(2) has been amended to read as follows:

(a) For the purpose of enforcing the provisions of KRS 311.550 to 311.620, agents of the board shall have the power and authority:

1. To administer oaths;
2. To enter upon professional premises *during periods when those premises are otherwise open to patients or the public,*
3. To obtain evidence, including but not limited to psychiatric or nonpsychiatric records, *by consent or pursuant to a subpoena or search warrant;*
4. To interview all persons; and
5. To require the production of books, papers, documents, or other evidence, either *by consent or pursuant to a subpoena or search warrant.*

2006 Kentucky Laws Ch. 175 (SB 127) (approved April 5, 2006)(emphasis added). Thus, agents of the Board of Medical Licen-

sure no longer have statutory authority to obtain or seize evidence without a warrant or a subpoena.

**7.** Former KRS § 311.605(2) only gave agents of the Board of Medical Licensure authority to conduct warrantless searches of and seizures within physicians' offices. The former statute gave no similar authority to the other investigators (namely, Mr. Burgess from the Attorney General's office and Mr. Kelly, from the Office of Drug Control) who accompanied and assisted the Board's agent during the warrantless search. While it could be argued that Mr. Kelly had statutory authority to conduct the warrantless search in his own right, *see* KRS § 218A.240, we decline to address the constitutionality of this statute at this time since the Commonwealth does not contend that KRS § 218A.240 in anyway authorized this search.

that was present in this case. *Id.* at 348–49, 107 S.Ct. at 1166 (good faith exception inapplicable where it can be found that state actors "had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment")(quoting *United States v. Peltier*, 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975)).

## II.

■ Given the illegality of the raid itself, we must next determine whether statements made by Appellant to Mr. Tout and Mr. Kelly during the raid should have been suppressed as "fruit of the poisonous tree." In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the U.S. Supreme Court stated:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Id.* at 599, 95 S.Ct. at 2259 (quoting *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)).

In this case, several people from various agencies converged on Appellant's office at approximately 10:30 a.m. Appellant's office staff testified that uniformed and non-uniformed persons entered simultaneously through both the front door and the back door. The Lewis County Sheriff and one of his deputies stood at the front door and prevented any patients from entering the premises during the raid. As patients were cleared from the building, two of the non-uniformed investigators reportedly started to open exam room doors in the clinic in an attempt to locate Appellant. When Appellant was found in an exam room, Appellant was directed into an office where he was confronted by Mr. Tout (Board of Medical Licensure), Mr. Kelly (Office of Drug Control), and Mr. Burgess (Attorney General's office).

Mr. Burgess testified that he had given *Miranda* warnings to Appellant when he visited Appellant's office on a prior occasion. When Mr. Burgess identified himself, Appellant told him that he believed that he did not have to talk to him. Mr. Burgess complied with Appellant's request and left the room. Thereafter, Mr. Tout identified himself as being from the Board of Medical Licensure and told Appellant that he wanted to talk to him about a complaint filed against him with the Board. Appellant agreed to talk with Mr. Tout, and after the questioning ceased, Appellant was not arrested or detained in anyway.

In *Brown v. Illinois, supra,* the Supreme Court identified several factors that were relevant in determining whether statements made during an illegal search or detention are "act[s] of free will unaffected by the initial illegality." *Id.* at 603, 95 S.Ct. at 2261. Voluntariness is a threshold requirement. *Id.* at 604, 95 S.Ct. at 2262. Other factors to be considered also include: (1) where there is an illegal detention or arrest, the giving of *Miranda* warnings; (2) the temporal proximity of the illegality and the statements; (3) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Id.* When the totality of the circumstances are weighed and considered, we believe that Appellant's statements are sufficiently attenuated to purge them from the taint of the illegal search, and thus, are admissible.

■ Initially, we believe the voluntariness threshold has clearly been satisfied. The trial court found that Appellant's statements were voluntary, and such a finding will be considered conclusive when supported by substantial evidence. *Henson v. Commonwealth*, 20 S.W.3d 466, 469 (Ky.1999). Appellant argues that his statements to Mr. Tout and Mr. Kelly were involuntary because he felt intimidated and compelled to make them by KRS § 311.990(6). KRS § 311.990(6) provides that it is a Class A misdemeanor to willfully resist, prevent, impede, obstruct, threaten, or interfere with the Board of Medical Licensure or any of its members or agents in the administration of its official duties. *Id.* Perhaps this would have qualified as a colorable argument were there any indication on the record that (1) Appellant was aware of and concerned about this statute during the interrogation; or (2) Mr. Tout or Mr. Kelly somehow threatened Appellant, either directly or impliedly, with prosecution if he did not comply with their requests or answer their questions.

Moreover, we find nothing in the record suggesting that any other kind of intimidation or coercion occurred in this instance. While Appellant may have felt some general pressure to cooperate with the agents who approached him during the raid at his office, such general pressure does not render an otherwise consensual encounter involuntary. *See I.N.S. v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."); *United States v. Drayton*, 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (general pressure to cooperate with police officers who approached defendants on a crowded bus not sufficient to render the encounter involun-

tary). Indeed, Appellant felt free enough to tell one of the agents whom he recognized as a law enforcement officer to leave the room during the questioning. Considering such circumstances in their totality, there is nothing to indicate that Appellant's statements were anything other than "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Accordingly, we find the trial court's finding of voluntariness to be supported by substantial evidence, and thus, conclusive.

We also find that Appellant was not seized or in anyway detained at the time he was approached and questioned by the agents. The raid was conducted during an admittedly busy time of day, with several agents and officers loudly announcing their presence to the many persons occupying the building. However, we find such circumstances to be markedly similar to the circumstances in *Delgado, supra*, where the Immigration and Naturalization Service ("INS") conducted unannounced "factory surveys" of several workforces for the purpose of searching for illegal aliens. *Id.* at 212–213, 104 S.Ct. at 1760–61. The Supreme Court rejected the factory workers' claim "that the entire work forces of the two factories were seized for the duration of the surveys when the INS placed agents near the exits of the factory sites" and systematically questioned each employee regarding their immigration status. *Id.* at 218, 104 S.Ct. at 1763. When the circumstances in this case are viewed in their totality, we also cannot say that Appellant was seized or somehow did not feel free to leave when he was approached by the investigators and asked questions at his place of business.

In light of the entirely voluntary nature of Appellant's statements and the fact that

Appellant was never placed in custody, we believe such intervening circumstances distinguish this case from *Brown, supra,* and the bulk of its progeny where the defendant was detained or placed in custody prior to questioning. In addition, the misconduct in this instance was not particularly flagrant as the warrantless raid was not designed or executed for the purpose of inducing Appellant to make statements, but rather, it was designed and executed for the purpose of seizing evidence from the clinic without the need to first obtain (1) consent; or (2) a warrant. When such circumstances are weighed and considered in their totality, we believe Appellant's statements were "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Brown, supra,* at 599, 95 S.Ct. at 2259. *Cf. Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (statements made while being illegally detained were sufficiently attenuated to be considered "acts of free will unaffected by any illegality in the initial detention"). Accordingly, we do not believe that Appellant's statements are subject to suppression as "fruit of the poisonous tree."

### III.

◼ Appellant next alleges that KRS §§ 218A.202 (6)(a) & (b) are facially unconstitutional because the language contained therein infringes upon well-recognized Fourth Amendment freedoms. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must estab-

lish that no set of circumstances exists under which the Act would be valid." *Rust v. Sullivan,* 500 U.S. 173, 183, 111 S.Ct. 1759,1767, 114 L.Ed.2d 233 (1991). "[T]he violation of the Constitution must be clear, complete and unmistakable in order to find the law unconstitutional." *Kentucky Industrial Utility Customers, Inc. v. Kentucky Utilities Company,* 983 S.W.2d 493, 499 (Ky.1998).

KRS § 218A.202 establishes the Kentucky All–Schedule Prescription Electronic Reporting (KASPER) System, an electronic database which monitors and records the dispensation of certain controlled substances within the Commonwealth by practitioners and pharmacists.[8] KRS § 218A.202 (6) sets forth those persons, programs, or bodies who are authorized to receive data from the KASPER System. Subsection (a) permits disclosure of KASPER data to any agency responsible for the licensure, regulation, or discipline of practitioners or pharmacists "who [are] authorized to prescribe, administer, or dispense controlled substances" if the designated representative of that agency "is involved in a bona fide specific investigation involving a designated person." KRS § 218A.202(6)(a). Similarly, subsection (b) permits disclosure of KASPER data to any peace officer "whose duty is to enforce the laws of this Commonwealth, of another state, or of the United States relating to drugs and who is engaged in a bona fide specific investigation involving a designated person." KRS § 218A.202(6)(b).

◼ In *Thacker v. Commonwealth,* 80 S.W.3d 451 (Ky.App.2002), the defendant

---

**8.** Appellant does not challenge, nor need we address, the overall constitutionality of the electronic monitoring system itself, including its primary function to collect and compile data regarding the dispensation of controlled substances within the Commonwealth. *See Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (statute establishing KAS-

PER-type system in New York was not an unconstitutional invasion of privacy); *Yeoman v. Commonwealth, Health Policy Board,* 983 S.W.2d 459, 473–74 (Ky.1998)(statute that allowed collection of private medical data by Kentucky Health Policy Board was not an unconstitutional invasion of privacy).

argued that a criminal investigator's warrantless examination of his KASPER report pursuant to KRS § 218A.202(6)(b) was an unreasonable search under both the federal and Kentucky constitutions. *Id.* at 455. The Court of Appeals disagreed, finding that such examinations were permissible exceptions to the warrant requirement "for administrative searches in furtherance of the State's regulation of industries that pose large risks to the public's health, safety, or welfare." *Id.* (citing to *Burger, supra*). However, as we have just explained, the Court of Appeal's reasoning in *Thacker, supra,* is misplaced, since a search cannot qualify as being administrative in nature unless its immediate purpose is "divorced from the State's general interest in law enforcement." *Ferguson, supra,* at 79, 121 S.Ct. at 1289. The immediate purpose of the warrantless examination in *Thacker, supra,* was certainly not "divorced from the State's general interest in law enforcement," as the examination of the defendant's KASPER report was conducted to uncover evidence of criminal wrongdoing for use in criminal proceedings. *Thacker, supra,* at 453. Thus, we hereby overrule *Thacker, supra,* to the extent that the Court found the administrative search exception to the warrant requirement to be applicable in this case.

■ The result in *Thacker, supra,* was nonetheless correct, however, because the access to data authorizations contained within KRS §§ 218A.202 (6)(a) & (b) are facially constitutional even without application of the administrative search exception to the warrant requirement. It is axiomatic that "application of the Fourth Amendment [and Section 10 of Kentucky's constitution] depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). As foreshadowed in *Thacker, supra,* we find that examination of KASPER reports by authorized personnel pursuant to KRS §§ 218A.202 (6)(a) & (b) does not constitute a "search" under the Fourth Amendment or Section 10 of Kentucky's constitution, since citizens have no reasonable expectation of privacy in this limited examination of and access to their prescription records.

In arriving at our holding today, we are guided by the U.S. Supreme Court's holding in *Smith v. Maryland, supra.* In *Smith,* the Supreme Court considered the warrantless, nonconsensual use of pen register surveillance by law enforcement personnel. *Id.* at 741, 99 S.Ct. at 2581. Pen registers are mechanical devises that are installed on telephone company property. *Id.* These devises record all the incoming and outgoing telephone numbers received or dialed by any particular telephone number. *Id.* The Supreme Court found that since "[a]ll telephone users" realize: (1) that "they must 'convey' phone numbers to the telephone company;" (2) "that the phone company has facilities for making permanent records of the numbers they dial, for they see a list of their long-distance (toll) calls on their monthly bills;" and (3) "pen registers and similar devices are routinely used by telephone companies 'for the purposes of checking billing operations, detecting fraud and preventing violations of law;'" then citizens simply cannot entertain "any actual expectation of privacy in the numbers they dial." *Id.* at 742, 99 S.Ct. at 2581. The *Smith* Court also noted the limited information actually gleaned from the pen register devises—identification of the telephone numbers themselves and the date and time called but not any actual content of the communication. *Id.* at 741, 99 S.Ct. at 2581.

In similar fashion, a KASPER report conveys only limited data to a restricted number of persons. First, it does not report the dispensation of all substances by practitioners or pharmacists but only those substances classified as "Schedules II, III, IV, and V controlled substances." KRS § 218A.202(1). Second, nothing in a KASPER report discloses a patient's condition, treatment, or communications with his or her physician, as the report merely conveys the patient's name, the drug dispensed, the date of dispensing, the quantity dispensed, the prescriber, and the dispenser. KRS § 218A.202(4). Finally, KASPER data is not available to the general public, but rather only to specified personnel who certify that they are conducting "a bona fide specific investigation involving a designated person." KRS § 218A.202(6)(a) & (b).

Furthermore, it is well known by citizens that any prescriptions they receive and fill will be conveyed to several third parties, including their physician, their pharmacy, and their health insurance company. As noted by the Court of Appeals in *Thacker, supra*, pharmacy records have long been subject not only to use and inspection by pharmacies, physicians, and health insurance companies but also to inspection by law enforcement and state regulatory agencies. *Id.* at 455 (citing KRS 218A.230, formerly KRS 218.140 and KRS 218.160).

In other cases, it has been held that citizens have no expectation of privacy in information that is contained on the outside of one's mail, *United States v. Choate*, 576 F.2d 165 (9th Cir.1978), or financial information that is "voluntarily conveyed to ... banks and exposed to their employees in the ordinary course of business." *United States v. Miller*, 425 U.S. 435, 442, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1976). The theory underlying each and every one of these cases, of course, is "(w)hat a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967).

Certainly, we understand that as our society becomes more global, more service-oriented, and more security conscious, we, as citizens, will find ourselves exposing more and more of our personal information to both private and public third parties, such a telephone companies, banks, grocery stores, credit card companies, health insurance companies, and pharmacies. To some extent, these are the risks we have assumed by living in such open societies. *See Miller, supra*, at 443, 96 S.Ct. at 1624 ("The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government .... This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.").

■ However, we are also mindful that it is our duty to jealously protect the well-recognized freedoms that are guaranteed by both Section 10 of our Constitution and the Fourth Amendment. If we perceived some sort of manipulation of these well-recognized freedoms by the state, we would certainly find this to be a very different case. *See Smith, supra*, at 741, n. 5, 99 S.Ct. at 2581 (imagining situations where the two-pronged *Katz* analysis would provide inadequate Fourth Amendment protections, such as a case where the government suddenly announced a nationwide warrantless entry program into homes). As it is, we believe that disclo-

sure of KASPER data to authorized law enforcement personnel and other state actors pursuant to KRS § 218A.202 by third parties who obtained the information in the ordinary course of business does not infringe upon or otherwise manipulate any well-recognized Fourth Amendment or Section 10 freedoms. *See also, Stone v. Stow,* 64 Ohio St.3d 156, 593 N.E.2d 294, 301 (1992) ("patients and physicians have *no* reasonable expectation of privacy in prescription records" other than right not to have the information disclosed to the general public). Accordingly, we conclude that KRS §§ 218A.202 (6)(a) & (b) are facially constitutional and do not violate the confines of the Fourth Amendment or Section 10 of the Kentucky Constitution.

## IV.

Appellant next argues there was insufficient evidence to convict him of unlawfully prescribing controlled substances pursuant to KRS § 218A.1404(3) since the statute only applies to persons who are not practitioners at the time of the unlawful act. This argument was recently addressed and rejected by this Court in *Commonwealth v. Sears,* 206 S.W.3d 309, 310–11 (Ky.2006), and thus, need not be addressed any further in this opinion.

## V.

■■■ Appellant contends that his conviction of four counts of unlawfully prescribing a controlled substance in violation of KRS § 218A.1404(3) offends the U.S. Constitution's proscription against Double Jeopardy, Section 13 of the Kentucky Constitution, and KRS § 505.020(1)(c). We disagree.

KRS § 218A.1404(3) states that "No person shall dispense, prescribe, distribute, or administer any controlled substance except as authorized by law." KRS § 505.020(1)(c) provides that a defendant

may not be convicted of more than one offense if "[t]he offense is designed to prohibit a continuing course of conduct and the defendant's course of conduct was uninterrupted by legal process, unless the law expressly provides that specific periods of such conduct constitute separate offenses." Appellant argues that KRS § 218A.1404(3), when read in conjunction with KRS § 218A.170(3), was designed to prohibit a course of conduct, instead of specific periods of conduct. Such an argument is completely unsupported by the plain language of KRS § 218A.1404(3), and therefore, must be rejected.

■■■ This Court has "a duty to accord to words of a statute their literal meaning unless to do so would lead to an absurd or wholly unreasonable conclusion." *Bailey v. Reeves,* 662 S.W.2d 832, 834 (Ky.1984). None of the words in the statute refer to a course of conduct, but rather, they refer to singular and specific periods of conduct. *Cf. Williams v. Commonwealth,* 178 S.W.3d 491, 495 (Ky.2005) (where statutory language defined "performance" as "any play, motion picture, photograph or dance," the Court stated that "[t]he singular form of 'photograph' read in conjunction with the term 'any' clearly indicates that the Legislature intended prosecution for each differing photograph"). Indeed, KRS § 218A.010(27) defines "prescription" as " a written, electronic, or oral order for a drug or medicine." Thus, the plain words of the statute clearly indicate that each dispensation, prescription, distribution, or administration of any controlled substance in violation of the law is a specific period of conduct constituting a separate offense.

On August 7, 2001, Appellant issued two separate "written orders" to a single patient, one for Valium, a Schedule IV Controlled Substance, and one for Vicodin, a Schedule III Controlled Substance. On

September 5, 2001, Appellant again issued two separate "written orders" to a single patient, one for Valium, a Schedule IV Controlled Substance, and one for Vicodin, a Schedule III Controlled Substance. Since each prescription (a.k.a. order) for a controlled substance is a specific period of conduct constituting a separate offense under KRS § 218A.1404(3), then the four charges for the four separate prescriptions issued on August 7 and September 5 did not in any way violate the U.S. Constitution's proscription against Double Jeopardy, Section 13 of the Kentucky Constitution, or KRS § 505.020(1)(c). *See Gray v. Commonwealth,* 979 S.W.2d 454, 455 (Ky. 1998) (multiple convictions for identical drug sales between the same persons on the same date, but at different times, does not violate double jeopardy or constitute multiple punishment for the same crime), *overruled on other grounds by Morrow v. Commonwealth,* 77 S.W.3d 558 (Ky.2002).

Appellant argues alternatively that *Commonwealth v. Grubb,* 862 S.W.2d 883 (Ky.1993) requires that the two prescriptions written on August 7, 2001 (as well as the two prescriptions written on September 5, 2001) must be merged since they were written at the same time and transmitted to the same patient. In *Grubb, supra,* our predecessor court held that "[a] single sales transaction between the same principals at the same time and place which violates a single statutory provision does not justify conviction or a sentence for separate crimes, even though more than one item of a controlled substance (of the same schedule) is involved." *Id.* at 884. We believe *Grubb, supra,* is distinguishable in that it involved (1) a trafficking statute; and (2) the sale of the same scheduled narcotic drugs. *Id.*

While the prescriptions written by Appellant on August 7, 2001, and September 5, 2001, were transmitted at the same time and to a single patient, they involved two different "orders" for two different classes or schedules of drugs. The issuing of two separate prescriptions for two separate classes or schedules of drugs is sufficiently distinguishable to constitute separate offenses under KRS § 505.020(1)(c). *See Williams, supra,* at 494–95 (defendant properly convicted of separate offenses pertaining to each of multiple nude photographs of child taken in quick succession); *Grubb, supra* at 885 ("it may be justifiable . . . to impose separate punishments for the possession of different classes (schedules) of drugs on the ground that different items clearly present different threats to society") (referring to *Kroth v. Commonwealth,* 737 S.W.2d 680 (Ky.1987)).

### VI.

Appellant contends his convictions and sentence were the result of (1) selective prosecution on account of race in violation of the Fourteenth Amendment of the U.S. Constitution; and (2) racial profiling in violation of KRS § 15A.195. Upon careful review of the record, we find no error on the part of the trial court in finding that Appellant failed to carry his burden to prove either of these claims. *See United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996).

### VII.

We need not discuss the remainder of Appellant's arguments as we find any alleged errors contained therein to be rendered moot by this opinion or otherwise unlikely to recur upon remand. *Ice v. Commonwealth,* 667 S.W.2d 671, 680 (Ky. 1984).

For the reasons set forth herein, the judgment of the Lewis Circuit Court is vacated and the case is remanded for further proceedings consistent with this opinion.

LAMBERT, C.J., GRAVES, McANULTY, ROACH, and SCOTT, JJ., concur.

MINTON and WINTERSHEIMER, J.J., concur in result only.