Veronica DOUGLAS, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–CA–000066–MR.

Court of Appeals of Kentucky.

July 27, 2012.

Kathleen K. Schmidt, Assistant Public Advocate, Frankfort, KY, for appellant.

Jack Conway, Attorney General of Kentucky, Jason B. Moore, Assistant Attorney General, Frankfort, KY, for appellee.

Before MOORE, STUMBO, and VANMETER, Judges.

*OPINION*

MOORE, Judge:

Veronica Douglas appeals the Lawrence Circuit Court's judgment convicting her of second-degree manslaughter and sentencing her to serve seven years of imprisonment. After a careful review of the record, we reverse because evidence concerning Douglas's hydrocodone prescriptions should not have been admitted. We remand for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 13, 2009, while Douglas was driving to her mother's home, the vehicle she was driving crossed over the yellow line into oncoming traffic and collided with the motorcycle driven by Michael Spence, killing him. Earlier that day, Douglas had ingested some Percocet and Valium that she had been prescribed.

Prior to trial, defense counsel moved to exclude from evidence the KASPER (Kentucky All–Schedule Prescription Electronic Reporting) record pertaining to Douglas, as well as any report or testimony from Dr. Gregory Davis, a pathologist. Counsel alleged in the motion to exclude as follows:

> [A]gents of the Commonwealth obtained one or more KASPER reports on [Douglas]. Those agents then further disclosed such report(s) to Dr. Greg Davis, whom the Commonwealth apparently intends to use as a scientific opinion witness at trial. His report explicitly mentions the contents of this report as significant to his conclusion that the

defendant, Ms. Douglas, was impaired at the time of a motor vehicle accident central to this case.

KRS 218A.202(6) restricts the distribution or disclosure of KASPER reports and their contents to enumerated persons for enumerated purposes. "Disclosure to any other person or entity ... is prohibited unless specifically authorized by this section." ... Subsection 12 provides that any other disclosure [except as provided in the statute] is a Class D felony for a first offense and a Class C felony for any subsequent offense.

By the plain language of the statute, disclosure of the KASPER report regarding Ms. Douglas to Dr. Davis by anyone was unlawful. His report, by its own language, cites that report as crucial to his conclusions. There is no other practical or meaningful remedy in this matter but exclusion.

The circuit court granted the motion to exclude in part and denied it in part. Specifically, the court granted the motion to exclude the introduction of Douglas's KASPER report into "direct testimony," and denied the motion to exclude the testimony of Dr. Davis.

Garret Jay Hammond, an EMT, spoke to Douglas at the scene of the accident. He testified that Douglas could not recall the accident before it occurred and that she believed she had fallen asleep while driving.

Dr. Ejhorn Nelson, a Professor of Clinical Pharmacology and Cell Biophysics at the University of Cincinnati College of Medicine, identified himself as a "career teacher in the addictions." He is a Certified Poison Information Specialist and a Licensed Pharmacist in Minnesota and Ohio. Dr. Nelson testified that a Certified Poison Information Specialist is someone who spent two thousand hours handling toxicology and overdose problems, and

then qualified by examination. He attested that he has been teaching since 1970, and he teaches physicians about toxicology, pharmacology, addictions, analgesics,[1] and treatment of overdoses.

Douglas's blood was drawn approximately two hours and fifteen minutes after the accident. Her blood tested positive for the presence of two drugs: diazepam/nordiazepam (also known as "Valium");[2] and oxycodone (also known as "Percocet"). Douglas allegedly had taken the Percocet because she had a dry tooth socket following surgery. Based upon the prescription history for Douglas that was provided to Dr. Nelson, he testified that in April 2009, Douglas had been prescribed Percocet following ovarian cyst surgery. The following discussion between the prosecutor and Dr. Nelson ensued:

> [Prosecutor:] Let's get more to the point. When a doctor gives you, says for four days and gives twenty pills, at the end of the fourth day, you're supposed to throw those pills away and not take them anymore, is that correct?
>
> [Dr. Nelson:] Not if it's "as needed for pain." No.
>
> [Prosecutor:] Okay, have you reviewed the actual prescription itself, to see if it's "as needed for pain" or if it was for four days?
>
> \* \* \*
>
> [Dr. Nelson:] I have a Xeroxed copy of a prescription ... dated 04/03/09 for Percocet [that reads] "one every four to six hours as needed for pain, number: 20."
>
> [Prosecutor:] Any refills for that?
>
> [Dr. Nelson:] No refills. So there's nothing about four days here.
>
> \* \* \*

> [Prosecutor:] Is it fair to say that twenty pills is four days' worth?
>
> [Dr. Nelson:] No. The drug is prescribed "as needed for pain." You take it when you have pain.
>
> [Prosecutor:] Okay, if you have pain associated with ovarian cysts, and then you fall and sprain your ankle, do you think that the physician intended that Percocet should be available for any type of pain, or pain associated with the ovarian cyst surgery?
>
> [Dr. Nelson:] I don't know why the physician prescribed the medication. It's an analgesic. I don't know whether he only prescribed it only for post-operative pain, or if he intended it to be used for ovarian cyst pain. I don't know. You can't tell from the prescription.
>
> [Prosecutor:] Okay. Again, let's say, two months ... goes by after this surgery, and a pain in a different area of the body occurs. Taking the oxycodone, the Percocets, that were prescribed for ovarian cysts, whether it be the surgery or the cysts itself, the doctor would not have intended just to use Percocet at any time she felt like, is that correct?
>
> [Dr. Nelson:] I think that's a fair statement. I think at that point, the onus is on the patient to consult with the physician.
>
> [Prosecutor:] Exactly. And if you don't ... use Percocet, oxycodone, or anything as a physician intended and as prescribed, that would be an abnormal use of the drug, is that correct?
>
> [Dr. Nelson:] It's a deviation from the prescription, yes.
>
> [Prosecutor:] And that would be abuse, correct?

---

1. When asked what an "analgesic" was, Dr. Nelson described it as a drug used to treat pain.

2. Douglas had a prescription for this drug to treat her panic and bipolar disorders.

[Dr. Nelson:] It would be misuse of the drug. It would depend on whether the person intended to get high with it or was using it to treat some other pain would be ... I would think of that as a misuse of the drug.

[Prosecutor:] It would be a gross deviation from the intended use, is that correct?

[Dr. Nelson:] I would have to know what the physician's intent in prescribing the medication was, and assuming that it was for ovarian cyst pain, then it should be used for that purpose.

[Prosecutor:] And no other.

[Dr. Nelson:] Yes.

Dr. Nelson also attested that Valium and oxycodone (Percocet) have side effects that include drowsiness and sleepiness. He stated that the two drugs can interact with each other to create a more potent effect. But in this case, he could not ascertain whether that occurred because he did not know the effect of each drug individually on Douglas. Dr. Nelson attested that in order to determine the effect of drugs on Douglas, he would need to know: her weight; the amount of medication of those types that she had taken in the past (i.e., her tolerance for each of the drugs); how much of the medication she took in the doses she ingested prior to the accident; and when those doses of medication were taken prior to the accident, in order to determine whether the levels of the medications in her blood were increasing, decreasing, or staying the same at the time the accident occurred. Dr. Nelson stated that one cannot assume that the level was higher at the time of the accident. The levels of the medication in the blood, as well as her tolerance for the drugs, could then be used to determine the effect of the drugs on Douglas.

Dr. Gregory Davis, a pathologist who practices both at the University of Kentucky's College of Medicine in Lexington, Kentucky, and at the Office of the Associate Chief Medical Examiner in Frankfort, Kentucky, testified for the prosecution. Dr. Davis attested that he had reviewed Douglas's prescription history, and Douglas had two active prescriptions for hydrocodone, an analgesic and narcotic,[3] at the time of the accident. She was prescribed a thirty-day supply (i.e., 90 pills) on May 28, 2009, and she was prescribed 24 more pills on June 11, 2009. The prescriptions were from two different doctors. Dr. Davis testified that it was unusual that Douglas had two overlapping prescriptions for the same medication. However, he also attested that, based upon the toxicology report he reviewed, Douglas did not have hydrocodone in her bloodstream at the time of the accident. Rather, the toxicology report reflected that Douglas had a different type of narcotic/analgesic, i.e., oxycodone (Percocet), in her bloodstream at the time of the accident. Dr. Davis testified that Douglas had been prescribed a four-day supply of oxycodone (i.e., twenty pills) on April 3, 2009. Dr. Davis attested that if Douglas had taken the drug beyond the four days that it had been prescribed, then she was abusing that drug. Therefore, if the oxycodone was prescribed for ovarian cyst surgical pain, any use of that drug other than for ovarian cyst surgical pain would qualify as abuse of that drug, according to Dr. Davis. Dr. Davis stated that, because Douglas had oxycodone and Valium in her bloodstream and she had no memory of things prior to the accident, he believed she was impaired at the time of the accident. However, Dr. Davis acknowledged that a traumatic event, such as a car accident, could cause memory loss.

3. Dr. Davis explained that a narcotic is a drug that will make a person sleepy.

The jury convicted Douglas of second-degree manslaughter. The court sentenced her to serve seven years of imprisonment.

Douglas now appeals, contending that evidence of her hydrocodone prescription history should have been barred from disclosure and its disclosure resulted in the improper admission of irrelevant and prejudicial evidence of other crimes or bad acts.

## II. ANALYSIS

"We review the admission of evidence for an abuse of discretion." *Wiley v. Commonwealth,* 348 S.W.3d 570, 580 (Ky.2010). "An abuse of discretion arises when the court's decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.*

The circuit court in this case ordered that Douglas's KASPER report be excluded from evidence. However, the court did not exclude Dr. Davis's testimony, which was based in part on his review of her KASPER report. Dr. Davis attested that Douglas had two active prescriptions for hydrocodone at the time of the accident. Rather than taking hydrocodone that morning, Douglas took oxycodone from an older prescription she had. Douglas did not have hydrocodone in her bloodstream at the time of the accident. Thus, the relevance of this testimony concerning her hydrocodone prescriptions is at issue.

Evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE[4] 401. "Although relevant, evidence may be excluded if its probative value is substan-tially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403.

The Commonwealth contends that the evidence concerning Douglas's hydrocodone prescriptions was admissible because Douglas claimed that the medications in her bloodstream were taken as prescribed. The Commonwealth alleges that the oxycodone that was in her bloodstream had been prescribed two months earlier following an ovarian cyst surgery, and Douglas did not take it on the day of the accident for pain caused by that surgery. Rather, she took the oxycodone for pain in other areas of her body. Despite the fact she had two active prescriptions for hydrocodone at the time of the accident, there was no hydrocodone in her bloodstream. During trial, the Commonwealth's Attorney referred to the fact that Douglas had multiple current hydrocodone prescriptions from different doctors as "doctor shopping."[5] The Commonwealth also argues on appeal that Douglas did not have a "reasonable expectation of privacy in her prescription records as recorded in the KASPER report, [so] the trial court did not abuse its discretion by denying her motion to exclude Dr. Davis's testimony as it regarded information he learned by reviewing her prescription history."

Douglas testified that she was prescribed hydrocodone to treat her rheumatoid arthritis, back pain, and tooth pain. Douglas attested that she had taken hydrocodone for six years.

Kentucky Rule of Evidence 404 provides:

---

4. Kentucky Rule of Evidence.

5. We pause to note that "doctor shopping" is a separate crime with which Douglas was never charged. *See Stidham v. Clark,* 74 S.W.3d 719, 721–22 (Ky.2002) (citing KRS 218A.140(1)).

(a) *Character evidence generally.* Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

(1) *Character of accused.* Evidence of a pertinent trait of character or of general moral character offered by an accused, or by the prosecution to rebut the same. . . .

\* \* \*

(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

The Kentucky Supreme Court has held: A trial court has the discretion to admit evidence of prior bad acts as long as that evidence is relevant, probative, and the potential for prejudice does not outweigh the probative value of such evidence. . . . The exceptions stated in KRE 404(b)(1) provide an illustrative list of when prior bad act evidence can be relevant not to prove the criminal disposition of the accused, but rather, to prove that the defendant actually committed the crime charged. . . . One exception that has been recognized by Kentucky courts to admit prior bad act evidence but that is not listed in KRE 404(b)(1) is the pattern of conduct exception or modus operandi.

*Dant v. Commonwealth,* 258 S.W.3d 12, 19 (Ky.2008) (internal quotation marks omitted). However, in order

for a prior bad act to be admitted to show a pattern of conduct, the facts surrounding the prior misconduct must be so strikingly similar to the charged offense as to create a reasonable probability that (1) the acts were committed by the same person, and/or (2) the acts were accompanied by the same *mens rea.*

*Id.* (internal quotation marks omitted).

 The act of getting multiple hydrocodone prescriptions is not "strikingly similar to the charged offense" of second-degree manslaughter. Therefore, it does not qualify for the "pattern of conduct" exception for admitting evidence of prior bad acts. Additionally, even if we were to assume for the sake of argument that obtaining the hydrocodone prescriptions satisfied one of the exceptions listed in KRE 404(b), the evidence is nevertheless inadmissible because it is not relevant and because the danger of undue prejudice from its admission outweighs any probative value it provides. Douglas did not have hydrocodone in her bloodstream at the time of the accident. Consequently, the fact that she had prescriptions for it did not "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. This is particularly true considering that Douglas did not challenge the allegation that she was the driver of the vehicle that crossed the center lane and hit and killed the victim.

 Moreover, the probative value of the evidence, even if relevant, was substantially outweighed by the danger of undue prejudice. The Commonwealth Attorney's insinuation that Douglas had been

committing the crime of "doctor shopping" when she obtained the multiple hydrocodone prescriptions adds to the undue prejudice. *See* KRE 403. To the extent the Commonwealth argues that Douglas did not have a "reasonable expectation of privacy in her prescription records as recorded in the KASPER report, [so] the trial court did not abuse its discretion by denying her motion to exclude Dr. Davis's testimony as it regarded information he learned by reviewing her prescription history," the Commonwealth misses the point: regardless of how Dr. Davis obtained the KASPER report or Douglas's prescription history, any evidence concerning her hydrocodone prescriptions was irrelevant and more prejudicial than probative. Thus, the circuit court abused its discretion in admitting the evidence concerning Douglas's hydrocodone prescriptions.

■ However, that does not end our analysis. Rather, we must now review this erroneous admission of evidence for harmless error. *See Caudill v. Commonwealth,* 120 S.W.3d 635, 660 (Ky.2003). "The test for harmless error is whether there is any reasonable possibility that, absent the error, the verdict would have been different." *Taylor v. Commonwealth,* 995 S.W.2d 355, 361 (Ky.1999).

Douglas was convicted of second-degree manslaughter, which is defined in KRS 507.040(1)(a) as: "A person is guilty of manslaughter in the second degree when he wantonly causes the death of another person, including, but not limited to, situations where the death results from the person's . . . [o]peration of a motor vehicle . . . ." The term "wantonly" is defined in KRS 501.020(3) as:

A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that

the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto.

In addition to being instructed on the offense of second-degree manslaughter, the jury in the present case was also instructed on the lesser included offense of reckless homicide. "Reckless homicide" is defined as: "A person is guilty of reckless homicide when, with recklessness he causes the death of another person." KRS 507.050. The term "recklessly" is defined in KRS 501.020(4) as:

A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

By introducing evidence that Douglas had obtained multiple hydrocodone prescriptions and insinuating that she had been "doctor shopping," the Commonwealth essentially suggested that she was a drug addict, despite the fact that she had no hydrocodone in her bloodstream at the time of the accident. Based upon this, there is a reasonable probability that absent the error of admitting this evidence the verdict would have been different because Douglas may have been convicted of the lesser included offense of reckless homicide. Therefore, the error was not harmless; the circuit court should not have

admitted any evidence of Douglas's hydrocodone prescriptions, including any testimony from Dr. Davis about those prescriptions.

We further note Douglas contends that neither the Commonwealth's Attorney nor Dr. Davis should have been given a copy of Douglas's KASPER report because the circuit court had not ordered copies of the report to be provided to them.

Pursuant to KRS[6] 218A.202,

(1) The Cabinet for Health and Family Services shall establish an electronic system for monitoring Schedules II, III, IV, and V controlled substances that are dispensed within the Commonwealth by a practitioner or pharmacist or dispensed to an address within the Commonwealth by a pharmacy that has obtained a license, permit, or other authorization to operate from the Kentucky Board of Pharmacy.

\* \* \*

(6) The Cabinet for Health and Family Services shall only disclose data to persons and entities authorized to receive that data under this section. Disclosure to any other person or entity, including disclosure in the context of a civil action where the disclosure is sought either for the purpose of discovery or for evidence, is prohibited unless specifically authorized by this section. The Cabinet for Health and Family Services shall be authorized to provide data to:

\* \* \*

(b) *A Kentucky peace officer certified pursuant to KRS 15.380 to 15.404, a certified or full-time peace officer of another state, or a federal peace officer whose duty is to enforce the laws of this Commonwealth, of another state, or of the United States relating to drugs and who is engaged in a bona fide specific investigation involving a designated person;*

\* \* \*

(8) *A person who receives data or any report of the system from the cabinet shall not provide it to any other person or entity except by order of a court of competent jurisdiction and only to a person or entity authorized to receive the data or the report under this section, except that:*

(a) *A peace officer specified in subsection (6)(b) of this section who is authorized to receive data or a report may share that information with other peace officers specified in subsection (6)(b) of this section authorized to receive data or a report if the peace officers specified in subsection (6)(b) of this section are working on a bona fide specific investigation involving a designated person. Both the person providing and the person receiving the data or report under this paragraph shall document in writing each person to whom the data or report has been given or received and the day, month, and year that the data or report has been given or received. This document shall be maintained in a file by each law enforcement agency engaged in the investigation;* and

(b) A representative of the Department for Medicaid Services may share data or reports regarding overutilization by Medicaid recipients with a board designated in subsection (6)(a) of this section, or with a law enforcement officer designated in subsection (6)(b) of this section; and

\* \* \*

---

6. Kentucky Revised Statute.

(9) The Cabinet for Health and Family Services, all peace officers specified in subsection (6)(b) of this section, all officers of the court, and all regulatory agencies and officers, in using the data for investigative or prosecution purposes, shall consider the nature of the prescriber's and dispenser's practice and the condition for which the patient is being treated.

(10) The data and any report obtained therefrom shall not be a public record, except that the Department for Medicaid Services may submit the data as evidence in an administrative hearing held in accordance with KRS Chapter 13B.

* * *

(12) *Intentional disclosure of transmitted data to a person not authorized by subsection (6) to subsection (8) of this section or authorized by KRS 315.121, or obtaining information under this section not relating to a bona fide specific investigation, shall be a Class D felony for the first offense and a Class C felony for each subsequent offense.*

(Emphasis added).

In the present case, we cannot locate a court order in the record providing for a copy of Douglas's KASPER report to be given to Dr. Davis or to the prosecutor; nor does the Commonwealth point us to one. Thus, Douglas is correct in her assertion that her KASPER report should not have been provided to them. According to *Commonwealth, Cabinet for Health and Family Services v. Bartlett*, 311 S.W.3d 224, 228 n. 2 (Ky.2010), this is a violation of the statute and, pursuant to KRS 218A.202(12), this is a felony by the person or people who transmitted the KASPER report to Dr. Davis and the prosecutor. We note that the Commonwealth does not contest Douglas's assertion that the prosecutor and Dr. Davis

were illegally provided copies of the KASPER report.

Rather, the Commonwealth simply argues that Douglas had no reasonable expectation of privacy as to the information "contained in the report, her prescription history," because "pharmacy records have long been subject not only to use and inspection by pharmacies, physicians, and health insurance companies but also to inspection by law enforcement and state regulatory agencies." The Commonwealth cites, *inter alia, Williams v. Commonwealth*, 213 S.W.3d 671, 681–82 (Ky.2006), in support of this proposition. The Kentucky Supreme Court in *Williams* held that

disclosure of KASPER data to authorized law enforcement personnel and other state actors pursuant to KRS § 218A.202 by third parties who obtained the information in the ordinary course of business does not infringe upon or otherwise manipulate any well-recognized Fourth Amendment [to the United States Constitution] or Section 10 [to the Kentucky Constitution] freedoms.

*Williams*, 213 S.W.3d at 683–84. It is important to note that in so holding, the Supreme Court specified that the type of disclosure of KASPER data they were referring to was the disclosure from third parties who obtained such information in the ordinary course of business, such as pharmacies, to *authorized* law enforcement personnel and other state actors *pursuant to* KRS 218A.202. In other words, the Court held that the only people who third parties are permitted to disclose the KASPER data to are those specifically authorized by KRS 218A.202 to receive it. In the present case, neither the prosecutor nor Dr. Davis qualified under KRS 218A.202 as a person authorized to receive the KASPER report. We pause to note that this is

disconcerting because this appears to be a recurring problem in the Commonwealth, *i.e.*, that prosecutors and other unauthorized people are being provided copies of KASPER reports without court orders directing those people to be given such reports, *see Bartlett,* 311 S.W.3d at 228 n. 2, without fear of prosecution.

Accordingly, the judgment of the Lawrence Circuit Court is reversed, and the case is remanded for a new trial.

STUMBO, Judge, concurs.

VANMETER, Judge, dissents and files separate opinion.

VANMETER, Judge, Dissenting:

I respectfully dissent. The undisputed evidence at trial was that Douglas ingested Valium (diazepam/nordiazepam) and Percocet (oxycodone), for which she had prescriptions, operated a motor vehicle, and caused the death of Michael L. Spence when her vehicle went into the opposite lane and struck Spence, who was driving a motorcycle. Blood tests revealed both drugs in her system at the time of the crash. This evidence alone was sufficient to support a jury verdict of second-degree manslaughter. *See Estep v. Commonwealth,* 957 S.W.2d 191 (Ky.1997); *McKenzie v. Commonwealth,* No. 2004–CA–002243–MR, 2006 WL 2918854 (Ky.App., Oct. 13, 2006). The fact that Douglas' prescriptions for hydrocodone may have been erroneously admitted into evidence was harmless error. RCr 9.24. I would affirm the Lawrence Circuit Court's judgment.