to stabbing him. We therefore conclude that double jeopardy does not preclude a remand for a new trial and that the State may retry Trice on the second degree murder and manslaughter charges.

CONCLUSION

We find plain error in the step instruction regarding second degree murder and manslaughter.

REVERSED AND REMANDED FOR A NEW TRIAL.

HEAVICAN, C.J., not participating.

———————

STATE OF NEBRASKA, APPELLEE, V.
KIMBERLY D. WIEDEMAN, APPELLANT.

___ N.W.2d ___

Filed July 12, 2013.    No. S-11-888.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

3. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.

4. **Constitutional Law: Due Process.** The Due Process Clause of the 14th Amendment contains a substantive component that provides at least some protection to a person's right of privacy.

5. ____: ____. The substantive component of the 14th Amendment protects (1) the individual interest in avoiding disclosure of personal matters and (2) the interest of independence in making certain kinds of important decisions.

6. **Controlled Substances: Health Care Providers: Statutes.** The State has broad police powers in regulating the administration of drugs by the health professions.

7. **Constitutional Law: Controlled Substances: Records.** Patients' substantive 14th Amendment privacy interests in prescription records are limited to the right not to have the information disclosed to the general public.

8. **Constitutional Law: Controlled Substances: Public Health and Welfare: Records.** A legitimate request for prescription information or records by a public official responsible for safeguarding public health and safety, subject to safeguards against further dissemination of those records, does not impermissibly invade any 14th Amendment right to privacy.

9. **Constitutional Law: Search and Seizure: Words and Phrases.** A "search" under the Fourth Amendment occurs whenever an expectation of privacy that society is prepared to consider reasonable is infringed.

10. ____: ____: ____. A reasonable expectation of privacy is an expectation that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.

11. **Constitutional Law: Search and Seizure.** The "persons, houses, papers, and effects" listed in the Fourth Amendment as protected objects remain central to understanding the scope of what the amendment protects.

12. **Controlled Substances: Health Care Providers: Statutes.** A reasonable patient buying narcotic prescription drugs knows or should know that the State, which outlaws the distribution and use of such drugs without a prescription, will keep careful watch over the flow of such drugs from pharmacies to patients.

13. **Constitutional Law.** There is no reasonable expectation of privacy in personal information a defendant knowingly exposes to third parties.

14. **Controlled Substances: Health Care Providers.** An investigatory inquiry into prescription records in the possession of a pharmacy is not a search pertaining to the pharmacy patient.

15. **Controlled Substances: Records.** A patient who has given his or her prescription to a pharmacy in order to fill it has no legitimate expectation that governmental inquiries will not occur.

16. **Criminal Law: Records.** Issuance of a subpoena to a third party to obtain records does not violate the rights of a defendant about whom the records pertain, even if a criminal prosecution is contemplated at the time the subpoena is issued.

17. **Search Warrants: Affidavits: Probable Cause: Appeal and Error.** In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a totality of the circumstances test. The question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.

Appeal from the District Court for Scotts Bluff County: Leo Dobrovolny, Judge. Affirmed.

Bell Island, of Island & Huff, P.C., L.L.O., for appellant.

Jon Bruning, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, and Miller-Lerman, JJ.

McCormack, J.

## I. NATURE OF CASE

Kimberly D. Wiedeman was charged and convicted of 10 counts of acquiring a controlled substance by fraud. The controlled substances were obtained pursuant to prescriptions written for chronic pain issues, but Wiedeman did not inform her medical providers that she was being prescribed similar medications elsewhere. Wiedeman argues that the fraudulent act was the singular failure to disclose to the other medical providers and that she should not be charged with multiple counts based on multiple prescriptions from the same doctor. Wiedeman also argues that her medical and prescription records were obtained in violation of her constitutional rights.

## II. BACKGROUND

Wiedeman was charged with 10 counts of acquiring a controlled substance by fraud, in violation of Neb. Rev. Stat. § 28-418 (Reissue 2008), a Class IV felony. Wiedeman was charged with violating § 28-418 on or about April 1, 2010 (count I), April 14 (count II), May 3 (count III), May 24 (count IV), June 1 (count V), June 13 (count VI), June 21 (count VII), July 19 (count VIII), August 9 (count IX), and August 23 (count X).

### 1. Pretrial Motions

Before trial, defense counsel made a plea in abatement, arguing that it was improper for the State to charge Wiedeman with 10 different counts of acquiring a controlled substance by fraud when there were merely 10 times Wiedeman filled prescriptions obtained through a single act of alleged deceit. The court overruled the motion.

Defense counsel next filed a motion to suppress Wiedeman's prescription records, because "[t]he search of [Wiedeman's] records was done without a warrant and was in violation

of [Wiedeman's] rights under the Fourth and Fourteenth Amendments to the United States Constitution; Sects. 1, 3, and 7 of the Bill of Rights to the Nebraska Constitution." The Scotts Bluff County Attorney had obtained Wiedeman's pharmacy records after issuing subpoenas to the various pharmacies in Scotts Bluff County pursuant to Neb. Rev. Stat. § 86-2,112 (Reissue 2008).

At the hearing on the motion to suppress, the prosecution offered exhibit 2, which was a copy of its subpoena to the pharmacy at Walgreens. No other subpoena was offered into evidence. Defense counsel admitted during the hearing that the prosecution had provided him with copies of three or four other subpoenas for three or four other pharmacies, and the investigator testified that all the subpoenas were identical. Nevertheless, defense counsel argued that the prescription records should be suppressed not only because any search is presumptively unreasonable without a warrant, but also because there was only one subpoena in evidence.

Defense counsel also moved to suppress the medical records and all physical evidence seized during a search of Wiedeman, her home, and her vehicle, arguing that the warrants for those searches were invalid.

The trial court denied the motion to suppress. The court explained that § 86-2,112 and Neb. Rev. Stat. § 28-414 (Cum. Supp. 2010) provided for the investigation of prescription records without a warrant. The court found that the warrants for medical records and other items seized were supported with probable cause and that the places to be searched and things to be seized were described with particularity. The case went to trial.

## 2. Trial

At trial, the evidence against Wiedeman consisted primarily of the prescription records and the testimony and records of her medical providers.

### (a) Medical Providers

Wiedeman suffered from chronic pain associated with rheumatoid arthritis and spinal fusions performed in 2004 and

2009. In August 2009, Wiedeman saw neurologist Dr. Betty Ball for her neck issues. Wiedeman continued to see Ball until August 2010.

Separately, beginning sometime in 2009 and continuing until July 2010, Wiedeman was a patient of nurse practitioner Cheryl Laux at the Chimney Rock Medical Center in Bayard, Nebraska (Chimney Rock). On January 12, 2009, Wiedeman signed a pain contract with Chimney Rock, apparently in conjunction with pain management issues resulting from her 2009 spinal fusion surgery. In the contract, Wiedeman agreed to receive opioid medication only from Chimney Rock and not from any other source. Wiedeman further agreed to fill her prescriptions for opioid medications at only one pharmacy of her choosing, not at multiple pharmacies. Laux testified that she did not know Wiedeman had any other medical providers.

During this period, Wiedeman also went to Quick Care Medical Services from time to time. There, she saw nurse practitioner Jodene Burkhart and also, as can be surmised from the record, a "Dr. Harkins." In December 2009, Burkhart ran blood tests that indicated Wiedeman had rheumatoid arthritis. Burkhart prescribed hydrocodone and recommended Wiedeman see a rheumatologist. The nearest rheumatologists are located in Colorado. Many of those were not accepting new patients, and the evidence was that Wiedeman has still not been able to see one.

Dr. Michelle Cheloha became Wiedeman's treating family practice physician in April 2010. Cheloha explained that Wiedeman needed to see a rheumatologist for a more definitive diagnosis and better treatment of her arthritis, but Cheloha tried to address the issues relating to Wiedeman's condition until a rheumatologist could do so. Cheloha was aware of urgent care visits to the clinic where Cheloha worked and explained that it looked like Wiedeman needed to establish routine medical care.

Cheloha was also aware of Wiedeman's past treatment with Ball and of the arthritis test results. It does not appear, however, that Cheloha knew Wiedeman was still regularly seeing Ball when Cheloha accepted Wiedeman as a patient.

Nor, apparently, was Cheloha aware of Wiedeman's treatment by Laux at Chimney Rock, or of the visits to Quick Care Medical Services. Cheloha admitted she did not specifically ask Wiedeman if she was seeing other physicians. But Cheloha did specifically recall discussing with Wiedeman what medications she had previously tried. Cheloha mistakenly concluded from that conversation, and from reviewing her records, that Wiedeman had last been prescribed a narcotic in 2008.

Wiedeman told Cheloha that she had been taking tremendous amounts of over-the-counter ibuprofen for her pain. Wiedeman also told Cheloha that she had "tried" her mother's narcotic medications relating to rheumatoid arthritis. Wiedeman did not disclose any other past or present prescriptions relating to her chronic pain issues.

Wiedeman saw Cheloha monthly. Cheloha began prescribing hydrocodone. She stated that the maximum dosage was 6 pills per day, or 180 pills per month. Cheloha started with a plan of 90 pills per month. By May 3, 2010, Cheloha increased the prescription to the maximum dosage of 180 pills per month. Cheloha eventually switched Wiedeman to oxycodone when the maximum dosage of hydrocodone was still failing to address Wiedeman's pain issues. Cheloha told Wiedeman not to mix hydrocodone with oxycodone. The maximum monthly dosage of oxycodone is also 180 pills.

On April 14, 2010, Cheloha represcribed 90 pills of hydrocodone after Wiedeman told Cheloha that her husband had accidentally taken her pills out of town. On June 1, Wiedeman told Cheloha that she had an allergic reaction to the oxycodone and that she had flushed the pills down the toilet. Cheloha rewrote a prescription for 180 hydrocodone pills, with one permitted refill. This was the only prescription written by Cheloha that allowed a refill, and the record is unclear whether this was intentional.

#### (b) Prescription Records

The State entered into evidence Wiedeman's prescription records from five different pharmacies for the period of August 1, 2009, to August 27, 2010. The prescription records reflect

that in August 2009, Ball prescribed 30 pills of oxycodone and the prescription was filled at the Community Pharmacy at Regional West Medical Center. No other prescriptions for controlled substances were filled in August.

In September 2009, Wiedeman was prescribed a total of 120 hydrocodone pills and 100 oxycodone pills. Ball prescribed 60 oxycodone pills, filled at the Community Pharmacy. Harkins at Quick Care Medical Services prescribed a total of 40 oxycodone and 120 hydrocodone pills on several different occasions, and those were filled at the pharmacy at Kmart.

In October 2009, Wiedeman filled prescriptions for a total of 40 oxycodone pills and 200 hydrocodone pills. She filled one 30-pill hydrocodone prescription from Ball at Community Pharmacy, a 60-pill hydrocodone prescription from Harkins at Kmart, a 40-pill oxycodone prescription from Harkins at Walgreens, and three different hydrocodone prescriptions from Burkhart at the Co-op Plaza Pharmacy, totaling 110 pills.

In November 2009, Wiedeman filled prescriptions totaling 60 oxycodone pills and 75 hydrocodone pills. One prescription was for 60 oxycodone pills from Ball through Community Pharmacy. One was for 40 hydrocodone pills from Harkins, filled at Kmart. Two smaller hydrocodone prescriptions were written by "Ernst, C.," and "Keralis, M.," respectively, and were filled at Walgreens.

In December 2009, Wiedeman obtained 120 oxycodone pills and 40 hydrocodone pills. She filled her regular 60-pill oxycodone prescription from Ball at Community Pharmacy. She filled a 60-pill oxycodone prescription from Laux at the Co-op Plaza Pharmacy and a 40-pill hydrocodone prescription from Burkhart at Kmart.

In January 2010, Wiedeman filled prescriptions totaling 60 oxycodone pills and 220 hydrocodone pills. The oxycodone prescription was from Ball, the hydrocodone prescriptions were all from Burkhart. Wiedeman filled prescriptions from Burkhart for 40 hydrocodone pills on January 2, 90 pills on January 16, and 90 pills on January 29.

In February 2010, Wiedeman received 40 oxycodone pills and 150 hydrocodone pills. February was the only month Ball

wrote prescriptions for both oxycodone and hydrocodone, for 40 and 30 pills respectively, filled at Community Pharmacy. Burkhart wrote a 90-pill prescription for hydrocodone, filled at Kmart. An "Agarwal, V.," prescribed 30 hydrocodone pills, filled at Walgreens.

In March 2010, Wiedeman received 80 oxycodone pills and 120 hydrocodone pills. Ball prescribed her regular dosage of 60 oxycodone pills, filled at Community Pharmacy, while Burkhart prescribed a total of 120 hydrocodone pills, filled at Kmart. A "Hadden/Keena" prescribed 20 oxycodone pills, filled at the Co-op Plaza Pharmacy.

In April 2010, Wiedeman filled prescriptions totaling 60 oxycodone pills and 320 hydrocodone pills. On April 1 (count I), Wiedeman filled a prescription for 90 hydroco- done pills from Cheloha at Walmart. On April 5, she filled a prescription from Burkhart for 30 hydrocodone pills at Kmart. On April 7, she filled a 60-pill oxycodone prescription from a "Zimmerman" at Community Pharmacy. On April 14 (count II), Wiedeman filled another prescription from Cheloha for 90 hydrocodone pills at Walmart. Wiedeman filled two prescriptions for hydrocodone from Harkins on April 17 and 19, each for 25 pills, at Kmart. On April 27, Wiedeman filled another hydrocodone prescription from Burkhart for 60 pills, also at Kmart.

In May 2010, Wiedeman filled prescriptions totaling 250 oxycodone pills and 230 hydrocodone pills. On May 3 (count III), at Walmart, she filled a 180-pill hydrocodone prescription from Cheloha. On May 10, at Kmart, Wiedeman filled a prescription from Burkhart for 50 hydrocodone pills. The next day, on May 11, she filled a 30-pill oxycodone prescription from Ball at Community Pharmacy. On May 14, Wiedeman filled an oxycodone prescription from Burkhart for 30 pills at Co-op Plaza Pharmacy. On May 24 (count IV), she filled another prescription from Cheloha for 180 oxycodone pills at Walgreens. Wiedeman filled a small prescription for 10 oxycodone pills at Walgreens, prescribed by "Hill, B.," on May 30.

In June 2010, Wiedeman filled prescriptions totaling 30 oxycodone pills from Ball and 540 hydrocodone pills from

Cheloha. She filled prescriptions from Cheloha for 180 pills each at Walmart on June 1 (count V) and again on June 13 (count VI). The June 13 prescription was presumably the refill of the June 1 prescription. Wiedeman filled a prescription from Cheloha for 180 hydrocodone pills at Kmart on June 21 (count VII). Wiedeman filled her prescription of 30 oxycodone pills from Ball at Community Pharmacy.

In July 2010, Wiedeman obtained 80 oxycodone pills and 240 hydrocodone pills. She filled a prescription from "Voth-Mueller, C.," for 20 oxycodone at Walgreens on July 5. She filled a 30-pill hydrocodone prescriptions from "Lacey, Trish," at Co-op Plaza Pharmacy on July 9. Wiedeman filled a prescription for 60 oxycodone pills from Ball at Community Pharmacy on July 6. She filled another 30-pill hydrocodone prescription from "Lacey, Trish," at Co-op Plaza Pharmacy on July 15. Finally, she filled a prescription on July 19 (count VIII) from Cheloha for 180 hydrocodone pills at Kmart.

In August 2010, Wiedeman obtained 180 oxycodone pills and 120 hydrocodone pills. On August 4, she filled her monthly prescription of 60 oxycodone pills from Ball at Community Pharmacy. On August 9 (count IX), Wiedeman filled her 120-pill oxycodone prescription from Cheloha at Walgreens. On August 23 (count X), she filled her prescription for 120 hydrocodone pills from Cheloha at Kmart.

These prescriptions came to an end when, sometime in August 2010, Wiedeman went to Chimney Rock to see Laux. Nurse practitioner Kevin Harriger saw Wiedeman because Laux was on medical leave. Wiedeman complained of pain associated with her rheumatoid arthritis and past neck surgeries. Harriger prescribed oxycodone, but became suspicious after Wiedeman left the clinic. After confirming with several pharmacies that Wiedeman was filling narcotic prescriptions from multiple doctors and multiple pharmacies, Harriger called the police, who began their investigation of Wiedeman.

### (c) Wiedeman's Statements

Investigator James Jackson testified as to a recorded interview with Wiedeman conducted as part of his investigation. Wiedeman admitted in the interview that she took the narcotic

medications for both pain and addiction. Wiedeman said she was taking up to 18 hydrocodone a day, on an "as-needed basis." In the interview, Wiedeman admitted that she knew that Cheloha would not have written all the prescriptions for her had Wiedeman told Cheloha about the other medical providers she was seeing and her other prescriptions.

At trial, Wiedeman testified that she always took her medications as directed. She said that she never obtained a prescription when she already had one. Wiedeman testified that most of her prescriptions were written for 12 pills a day and "then it went up." She was sure she never took in more than the largest number prescribed per day, and she did not think she had ever taken more than 15 in one day. Wiedeman testified that she never took hydrocodone and oxycodone on the same day. She explained that she went to different medical providers and filled her prescriptions at different pharmacies simply because she traveled a lot for work.

Defense counsel's motions for directed verdict were overruled. The jury found Wiedeman guilty of all 10 counts. She appeals.

### III. ASSIGNMENTS OF ERROR

Wiedeman assigns that the trial court erred in (1) failing to direct a verdict when the State failed to prove Wiedeman obtained a prescription by fraud, deception, subterfuge, or misrepresentation; (2) failing to sustain the motion to suppress pharmacy records when they were seized without a warrant; (3) failing to sustain the motion to suppress when the State failed to offer the subpoenas which it used to obtain Wiedeman's pharmacy records; and (4) finding the affidavit for the warrant set forth sufficient facts establishing probable cause.

### IV. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review. Regarding historical facts, we review the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment

protections is a question of law that we review independently of the trial court's determination.[1]

[2] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[2] The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[3]

## V. ANALYSIS

### 1. Failure to Suppress
### Pharmacy Records

We first address Wiedeman's arguments that the manner in which the State obtained her pharmacy records and offered those records into evidence violated her 4th and 14th Amendment rights. Section 28-414(3)(a) provides that prescriptions for all controlled substances listed in Schedule II shall be kept in a separate file by the dispensing practitioner and that the practitioner "shall make all such files readily available to the department and law enforcement for inspection without a search warrant." Without challenging the statute itself, Wiedeman argues that law enforcement violated her rights under the 4th and 14th Amendments to the U.S. Constitution and article I, § 7, of the Nebraska Constitution by obtaining her prescription records without a warrant. Alternatively, she argues those rights required that the State obtain her records by means of something "in between a subpoena and a warrant" and that it demonstrate at trial the prescription records were obtained "in a proper manner."[4]

---

[1] *State v. Borst*, 281 Neb. 217, 795 N.W.2d 262 (2011).

[2] *State v. McCave*, 282 Neb. 500, 805 N.W.2d 290 (2011).

[3] *Id*.

[4] Brief for appellant at 19.

[3] The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.[5] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

[4,5] In addition, the Due Process Clause of the 14th Amendment contains a substantive component that provides at least some protection to a person's right of privacy.[6] The U.S. Supreme Court has said that this privacy entails at least two kinds of interests: (1) the individual interest in avoiding disclosure of personal matters and (2) the interest of independence in making certain kinds of important decisions.[7]

Virtually every governmental action interferes with personal privacy to some degree.[8] The question in each case is whether that interference violates a command of the U.S. Constitution.[9]

### (a) 14th Amendment

We find the U.S. Supreme Court opinion in *Whalen v. Roe*[10] to be dispositive of Wiedeman's arguments under the 14th Amendment. In *Whalen*, the U.S. Supreme Court held that the collection of narcotics prescription records in a database accessible to certain health department employees and investigators—and also to general law enforcement pursuant to

---

[5] See, *Omni v. Nebraska Foster Care Review Bd.*, 277 Neb. 641, 764 N.W.2d 398 (2009); *State v. Bakewell*, 273 Neb. 372, 730 N.W.2d 335 (2007).

[6] *State v. Senters*, 270 Neb. 19, 699 N.W.2d 810 (2005).

[7] *Whalen v. Roe*, 429 U.S. 589, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977).

[8] *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).

[9] *Id.*

[10] *Whalen v. Roe*, *supra* note 7.

a judicial subpoena or court order—did not violate the 14th Amendment right to privacy.[11]

[6] The Court found that the reporting and monitoring of prescription records was a rational exercise of the state's broad police powers and that it is "well settled that the State has broad police powers in regulating the administration of drugs by the health professions."[12] Further, it was reasonable for the state to believe that the recording program would have a deterrent effect on potential violators and that it would aid in the detection or investigation of specific instances of abuse or misuse of dangerous drugs.[13]

The Court then concluded that the program did not "pose a sufficiently grievous threat to either [14th Amendment privacy] interest to establish a constitutional violation."[14] Concerning the interest in avoiding disclosure of personal matters, the Court found that the recording program contained adequate safeguards against disclosure of prescription records to the general public. Although prescription records were automatically disclosed to certain state employees, the Court found such disclosures were not meaningfully distinguishable from "a host of other unpleasant invasions of privacy that are associated with many facets of health care."[15] Patients must disclose private medical information to "doctors, to hospital personnel, to insurance companies, and to public health agencies, . . . even when the disclosure may reflect unfavorably on the character of the patient."[16]

As for the privacy interest of independence in making certain kinds of important decisions, the Court held that the recording program did not deprive patients of their right to decide independently, with the advice of a physician, to use

[11] *Id.*

[12] *Id.*, 429 U.S. at 603 n.30.

[13] See *Whalen v. Roe, supra* note 7.

[14] *Id.*, 429 U.S. at 600.

[15] *Id.*, 429 U.S. at 602.

[16] *Id.*

the medication.[17] This was true despite the uncontested evidence that the program discouraged some patients from using monitored medications. The Court observed on this point that the state "no doubt could prohibit entirely the use of particular Schedule II drugs."[18]

In sum, the prescription recordkeeping scheme considered in *Whalen* provided "proper concern with, and protection of, the individual's interest in privacy."[19] Therefore, it did not violate patients' 14th Amendment privacy rights.

Nebraska does not have a centralized database for prescription records, but instead mandates that such records be kept by the pharmacies for a period of 5 years.[20] Nebraska law provides protection against dissemination of these prescription records to the general public. Neb. Rev. Stat. § 38-2868 (Reissue 2008) states that pharmacy records shall be privileged and confidential and may be released only to the patient, caregiver, or others authorized by the patient or his or her legal representative; the treating physician; other physicians or pharmacists when such release is necessary to protect patient health or well-being; or other persons or governmental agencies authorized by law to receive such information.

[7,8] Weighing the State's significant interest in the regulation of potentially dangerous and addictive narcotic drugs against the minimal interference with one's ability to make medical decisions and the protections from broader dissemination to the general public, we find the State did not violate Wiedeman's 14th Amendment privacy rights through its warrantless, investigatory access to her prescription records pursuant to § 28-414. Other courts have explained that patients' substantive 14th Amendment privacy interests in prescription records are "limited to the right not to have the information

---

[17] *Whalen v. Roe, supra* note 7.

[18] *Id.*, 429 U.S. at 603.

[19] *Id.*, 429 U.S. at 605.

[20] See Neb. Rev. Stat. § 28-411 (Reissue 2008) and § 28-414.

disclosed to the general public."[21] We agree. A legitimate request for prescription information or records by a public official responsible for safeguarding public health and safety, subject to safeguards against further dissemination of those records, does not impermissibly invade any 14th Amendment right to privacy.[22] Having so concluded, we find no support for Wiedeman's suggestion that the 14th Amendment demands a special process for access to her prescription records or for the use of such records in court. We note that Wiedeman did not allege that Jackson's investigation of the prescription records was for a discriminatory or arbitrary purpose or for anything other than a legitimate investigatory purpose.

### (b) Fourth Amendment

[9-11] We next address Wiedeman's claims under the Fourth Amendment. The U.S. Supreme Court has said a "search" under the Fourth Amendment occurs whenever an "expectation of privacy that society is prepared to consider reasonable is infringed."[23] A reasonable expectation of privacy is an expectation that has a source outside of the Fourth Amendment, by reference either to concepts of real or personal property law or to understandings that are recognized and permitted by society.[24] Under the reasonable-expectation-of-privacy test, however, "the four items listed in the [Fourth] Amendment as the protected objects remain central to understanding the scope of what the Amendment protects."[25] Otherwise, "the

---

[21] *Stone v. Stow*, 64 Ohio St. 3d 156, 166, 593 N.E.2d 294, 301 (1992). See, also, *State v. Russo*, 259 Conn. 436, 790 A.2d 1132 (2002).

[22] See, *Whalen v. Roe, supra* note 7; *State v. Russo, supra* note 21.

[23] *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984).

[24] See *U.S. v. Jones*, ___ U.S. ___, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012).

[25] Thomas K. Clancy, The Fourth Amendment, Its History and Interpretation 10 (2008). See, also, e.g., *Kyllo v. United States*, 533 U.S. 27, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001); *State v. Cortis*, 237 Neb. 97, 465 N.W.2d 132 (1991); *State v. Harms*, 233 Neb. 882, 449 N.W.2d 1 (1989).

phrase 'in their persons, houses, papers, and effects' would have been superfluous."[26]

The investigatory inquiry into prescription records is distinguishable from the invasion of the "person" that occurs during drug or alcohol testing.[27] Wiedeman had no ownership or possessory interest in the pharmacies from where the records were obtained. And, even though they may concern Wiedeman, the prescription records are not Wiedeman's effects or papers.

In *State v. Cody*,[28] we explained:

"Property ownership is one factor to consider in determining whether a defendant has a reasonable expectation of privacy. . . . Other factors include the nature of the place searched, . . . whether the defendant had a possessory interest in the thing seized or the place searched, whether the defendant had a right to exclude others from that place, whether the defendant exhibited a subjective expectation that the place would remain free from governmental intrusion, whether the defendant took precautions to maintain privacy, and whether the defendant was legitimately on or in possession of the premises searched."

We generally ask whether the defendant owned the premises, property, place, or space, and whether the defendant had dominion or control over such things or places based on permission from the owner.[29] Wiedeman fails to have any interest in the prescription records under any of these property-based

---

[26] *U.S. v. Jones, supra* note 24, 132 S. Ct. at 949.

[27] See, *Ferguson v. Charleston*, 532 U.S. 67, 121 S. Ct. 1281, 149 L. Ed. 2d 205 (2001); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995); *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989).

[28] *State v. Cody*, 248 Neb. 683, 694, 539 N.W.2d 18, 26 (1995).

[29] See, *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011); *State v. Smith*, 279 Neb. 918, 782 N.W.2d 913 (2010); *State v. Sinsel*, 249 Neb. 369, 543 N.W.2d 457 (1996); *State v. Baltimore*, 242 Neb. 562, 495 N.W.2d 921 (1993); *State v. Trahan*, 229 Neb. 683, 428 N.W.2d 619 (1988).

tests. Fourth Amendment rights are personal rights; they may not be vicariously asserted.[30]

[12] If the expectation of privacy in a pharmacy's prescription records is not based in the four items listed in the Fourth Amendment, or in concepts of real or personal property law, then it can only be reasonable if so recognized and permitted by society.[31] Societal expectations as to prescription records were aptly described by the Washington Court of Appeals:

> When a patient brings a prescription to a pharmacist, the patient has a right to expect that his or her use of a particular drug will not be disclosed arbitrarily or randomly. But a reasonable patient buying narcotic prescription drugs knows or should know that the State, which outlaws the distribution and use of such drugs without a prescription, will keep careful watch over the flow of such drugs from pharmacies to patients.[32]

While the state cannot take away an established societal expectation of privacy through the mere passage of a law,[33] there is a long history of governmental scrutiny in the area of narcotics and other controlled substances. All states highly regulate prescription narcotics, and many state statutes specifically allow for law enforcement investigatory access to those records without a warrant.[34] This well-known and long-established regulatory history significantly diminishes any societal expectation of privacy against governmental investigation of narcotics prescriptions.

---

[30] See *Rakas v. Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). See, also, *State v. Cody, supra* note 28.

[31] See *U.S. v. Jones, supra* note 24.

[32] *Murphy v. State*, 115 Wash. App. 297, 312, 62 P.3d 533, 541 (2003). See, also, e.g., *State v. Russo, supra* note 21.

[33] See, e.g., *Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979).

[34] See 50 State Statutory Surveys, Health Care Records and Recordkeeping, 0100 Surveys 53 (West 2012).

[13] Furthermore, the U.S. Supreme Court has repeatedly said there is no reasonable expectation of privacy in personal information a defendant knowingly exposes to third parties.[35] This is true even when the information revealed to the third party is revealed on the assumption that it will be used only for a limited purpose and on the assumption that the confidence in the third party will not be betrayed.[36]

Thus, there is no reasonable expectation of privacy in situations such as the numerical information conveyed to a telephone company of the numbers dialed,[37] financial records given to an accountant,[38] or personal account records maintained at one's bank.[39] In *State v. Kenny*,[40] we held that the defendant had no reasonable expectation of privacy in letters he sent through the mail. We explained that while the defendant "may have hoped for privacy, . . . he had no 'expectation of privacy' as contemplated by the fourth amendment to the U.S. Constitution."[41]

In *Whalen*,[42] the U.S. Supreme Court addressed the appellees' Fourth Amendment arguments in a footnote. With little explanation, the Court held that a prescription recordkeeping scheme also did not violate any privacy right emanating from the Fourth Amendment.[43] *Whalen* may be distinguishable to the extent that the Court was not presented with a targeted

---

[35] *Smith v. Maryland, supra* note 33; *United States v. Miller*, 425 U.S. 435, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976); *Couch v. United States*, 409 U.S. 322, 93 S. Ct. 611, 34 L. Ed. 2d 548 (1973); *Hoffa v. United States*, 385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966); *Lopez v. United States*, 373 U.S. 427, 83 S. Ct. 1381, 10 L. Ed. 2d 462 (1963).

[36] *United States v. Miller, supra* note 35. See, also, *United States v. White*, 401 U.S. 745, 91 S. Ct. 1122, 28 L. Ed. 2d 453 (1971); *Hoffa v. United States, supra* note 35; *Lopez v. United States, supra* note 35.

[37] *Smith v. Maryland, supra* note 33.

[38] *Couch v. United States, supra* note 35.

[39] *United States v. Miller, supra* note 35.

[40] *State v. Kenny*, 224 Neb. 638, 399 N.W.2d 821 (1987).

[41] *Id.* at 642, 399 N.W.2d at 824.

[42] *Whalen v. Roe, supra* note 7.

[43] *Id.*

police investigation.[44] Nevertheless, we find *Whalen* to be persuasive authority for the conclusion that disclosure by a pharmacy of patient prescription records to law enforcement is not a search from the standpoint of the patient.

The desire for medical care will not negate the voluntariness of the disclosure to third-party pharmacies.[45] The desire to have a checking account or credit card, to use a telephone, or to mail a letter does not negate the voluntariness of the disclosure to the entities necessary for those important services. Indeed, the Court in *Whalen* suggested that there is no right to narcotic drugs at all; the state would be within its power to prohibit access to such drugs altogether. While there is a trust relationship between the pharmacy and the patient, cases such as *Smith v. Maryland*,[46] *United States v. Miller*,[47] *Couch v. United States*,[48] and *Kenny*[49] hold that disclosure, even on the assumption that the confidence in the third party will not be betrayed,[50] negates any expectation of privacy cognizable under the Fourth Amendment.

The court in *Williams v. Com.*[51] thus held that the law enforcement investigation of prescription records under a law similar to § 28-414 is not a search under the Fourth Amendment. Noting the proposition that what is voluntarily exposed to the public is not subject to Fourth Amendment protections, the court concluded that its citizens "have no reasonable expectation of privacy in this limited examination of and access to their prescription records."[52] The court further explained that "it is well known by citizens that any

---

[44] See, e.g., *United States v. Miller, supra* note 35; *Ferguson v. Charleston, supra* note 27.

[45] See *Ferguson v. Charleston, supra* note 27.

[46] *Smith v. Maryland, supra* note 33.

[47] *United States v. Miller, supra* note 35.

[48] *Couch v. United States, supra* note 35.

[49] *State v. Kenny, supra* note 40.

[50] See cases cited *supra* note 36.

[51] *Williams v. Com.*, 213 S.W.3d 671 (Ky. 2006).

[52] *Id.* at 682.

prescriptions they receive and fill will be conveyed to several third parties, including their physician, their pharmacy, and their health insurance company."[53] And "pharmacy records have long been subject not only to use and inspection by [those entities] but also to inspection by law enforcement and state regulatory agencies."[54]

The court in *Williams* opined that it would be "mindful" of its duty to jealously protect the freedoms of the Fourth Amendment and would hold differently if it "perceived some sort of manipulation of these well-recognized freedoms by the state."[55] But it did not find such manipulation in the case of law enforcement's obtaining prescription records from businesses that keep those records in the ordinary course of business and pursuant to a statutory obligation to do so.[56]

[14,15] We agree that an investigatory inquiry into prescription records in the possession of a pharmacy is not a search pertaining to the pharmacy patient. A patient who has given his or her prescription to a pharmacy in order to fill it has no legitimate expectation that governmental inquiries will not occur.

[16] Issuance of a subpoena to a third party to obtain records does not violate the rights of a defendant about whom the records pertain, even if a criminal prosecution is contemplated at the time the subpoena is issued.[57] The U.S. Supreme Court in *Miller* explained that the bank in possession of account records, not the customer whom they concern, has standing to challenge a subpoena.[58] Although it may be "unattractive" for a business not to notify its customer of the subpoena, such lack of notification is simply "without legal consequences" under the Fourth Amendment.[59]

---

[53] *Id*. at 683.

[54] *Id*.

[55] *Id*.

[56] *Id*. See, also, *State v. Welch*, 160 Vt. 70, 624 A.2d 1105 (1992).

[57] See *United States v. Miller, supra* note 35.

[58] *Id*.

[59] *Id*., 425 U.S. at 443 n.5.

Wiedeman lacks standing to challenge the manner of the State's inquiry into the prescription records or the constitutional or statutory adequacy of the subpoenas offered and not offered into evidence. There is no argument on appeal that there is insufficient foundation for the prescription records or that the prescription records are not what they purport to be. We find no merit to Wiedeman's assertion that the admission of the pharmacy records violated her constitutional or statutory rights.

## 2. FAILURE TO SUPPRESS
### MEDICAL RECORDS

[17] Next, Wiedeman argues that her medical records should have been suppressed because the warrant for her medical records lacked probable cause. In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a "totality of the circumstances" test.[60] The question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.[61]

Aside from the argument that the prescription records should have been stricken—an argument we conclude has no merit due to our analysis above—Wiedeman asserts that the probable cause affidavit was insufficient because it failed to disclose information about any false or misleading statement made by her. In the affidavit, Jackson explained that Harriger, a nurse practitioner, had contacted him with concerns that Wiedeman was abusing prescription drugs. Harriger had become suspicious that Wiedeman was traveling a significant distance to the clinic. Harriger contacted a couple of pharmacies that confirmed Wiedeman was seeing several doctors and filling multiple narcotics prescriptions at different pharmacies. This information, combined with the prescription records that revealed Wiedeman was filling multiple prescriptions at multiple pharmacies for an extraordinary number of pills,

---

[60] *State v. Sprunger*, 283 Neb. 531, 811 N.W.2d 235 (2012).

[61] *Id*.

established probable cause. We find no merit to this assignment of error.

### 3. Sufficiency of Evidence

Lastly, Wiedeman challenges the sufficiency of the evidence to support her conviction of 10 counts of violating § 28-418. In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[62] The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[63]

Section 28-418 states it shall be unlawful for any person "knowingly or intentionally . . . [t]o acquire or obtain or to attempt to acquire or obtain possession of a controlled substance by theft, misrepresentation, fraud, forgery, deception, or subterfuge"[64] or "[t]o communicate information to a practitioner in an effort to unlawfully procure a controlled substance . . . or a medical order for a controlled substance issued by a practitioner authorized to prescribe."[65]

We find no merit to Wiedeman's argument that filling multiple prescriptions obtained by virtue of a single misrepresentation or act of deception is but a single violation. The statute plainly states that a violation occurs upon the act of acquiring or obtaining. Section 28-418 does not state that each act of acquiring or obtaining must be accompanied by a new act of misrepresentation or deception. When the act of obtaining the prescription was facilitated by a continuing deception based on a single conversation or other event, the statute is satisfied.

---

[62] *State v. McCave, supra* note 2.

[63] *Id.*

[64] § 28-418(1)(c).

[65] § 28-418(1)(i).

The court did not err in concluding that Wiedeman committed multiple violations of § 28-418 each time she obtained and filled a prescription from Cheloha. Each prescription from Cheloha would not have been written but for Wiedeman's failure to disclose that she was already taking narcotics through prescriptions from other providers.

We also find no merit to Wiedeman's claim that she never affirmatively acted in a way that could violate § 28-418, because she did not "affirmatively" provide fraudulent or false information to anyone. Pointing out dictionary definitions of "misrepresentation," "fraud," "deception," and "subterfuge," Wiedeman argues that in order to violate § 28-418, there must be "[s]ome word or deed that hides or misleads the one who relies upon the act or deed."[66]

Even accepting Wiedeman's definitions, we find the record more than adequate to support the trial court's findings. It is apparent that Wiedeman affirmatively misrepresented her medical history. Particularly, Wiedeman told Cheloha she had once "tried" her mother's narcotic medications, but otherwise relied on over-the-counter ibuprofen for her pain. In fact, at the time of her first visit to Cheloha, Wiedeman had been averaging 200 pills per month since September 2009, more than the maximum dosage. With the addition of the prescriptions by Cheloha, Wiedeman was able to obtain an average of over 400 pills per month. Wiedeman admitted to Jackson that she knew Cheloha would not have written all the prescriptions for her had she told Cheloha about the other medical providers and her other prescriptions. The pain contract Wiedeman signed with Laux in January 2009 is further evidence of such knowledge. We find the evidence sufficient to support the convictions.

## VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

AFFIRMED.

CASSEL, J., not participating.

---

[66] Brief for appellant at 13.

Connolly, J., dissenting.

The Fourth Amendment forbids a government agent's intrusion into a person's legitimate expectation of privacy to search for evidence of a crime without judicial oversight and probable cause. Such searches are per se unreasonable, subject only to a few well-defined exceptions.[1] Here, no exceptions apply.

But the majority opinion concludes that if a citizen presents a prescription order for a narcotic drug at a pharmacy, he has no expectation that the information will remain private because (1) he voluntarily disclosed the prescription and (2) the government heavily regulates the dispensing of narcotics. The majority reasons that once a person gives the prescription to a pharmacist, it is no longer private information. Thus, a prosecutor can subpoena a person's prescription records without violating the Fourth Amendment; i.e., no search of personal information occurs if the target of a criminal investigation has publicly exposed it.

I believe that this decision will have far-reaching effects for citizens' Fourth Amendment protections. Information that citizens normally considered private will not be protected by the Fourth Amendment if it is held by a third party that is subject to extensive regulation. And as we know, many human activities are subject to extensive federal and state regulations: e.g., banking, investing, attending school, or seeking medical or psychiatric care. But if an individual is suspected of a crime and his personal information is held by a third party that is subject to regulation, the majority would permit the state—without probable cause or court order—to invade by subpoena a citizen's protected zone of privacy.

According to the majority opinion, because Wiedeman gave her prescriptions to a pharmacist, she voluntarily disclosed this information and had no expectation of privacy in her personal medical information. This "voluntarily disclosed" rationale will not be limited to narcotic prescriptions. It necessarily

---

[1] *Chandler v. Miller*, 520 U.S. 305, 117 S. Ct. 1295, 137 L. Ed. 2d 513 (1997); *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); *State v. Borst*, 281 Neb. 217, 795 N.W.2d 262 (2011).

means that if a citizen presents a prescription to a pharmacist, he or she has voluntarily disclosed any medical information disclosed by the prescription. Nor will the "voluntarily disclosed" rationale be limited to prescription orders. And I do not believe this result is required by or consistent with the U.S. Supreme Court's decision in *Whalen v. Roe*.[2]

The majority opinion misinterprets the Court's decision in *Whalen*. It did not hold that citizens have no reasonable expectation of privacy in their prescription records. There, the plaintiffs were physicians and patients who challenged a state statutory scheme that required doctors and pharmacists to report prescriptions for narcotic drugs to a state agency. The plaintiffs challenged the act as an invasion of the patients' privacy interests; i.e., its potential to disclose their private medical information would have a chilling effect on a patient's or a doctor's medical decisions.

Notably, the Court did not disturb the lower court's ruling that the doctor-patient relationship is one of the "zones of privacy" accorded constitutional protection[3]:

An individual's physical ills and disabilities, the medication he takes, [and] the frequency of his medical consultation are among the most sensitive of personal and psychological sensibilities. One does not normally expect to be required to have to reveal to a government source, at least in our society, these facets of one's life. Indeed, generally one is wont to feel that this is nobody's business but his doctor's and his pharmacist's.[4]

Instead, the Court held that the act did not violate patients' privacy interests under the 14th Amendment because its safeguards adequately protected their interests in keeping their medical information confidential. Because Whalen was not a criminal case, no one challenged the law as authorizing a warrantless search of a person's prescription records during a targeted criminal investigation. More important, the Court's

[2] *Whalen v. Roe*, 429 U.S. 589, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977).

[3] See *Roe v. Ingraham*, 403 F. Supp. 931, 935 (S.D.N.Y. 1975), *reversed, Whalen, supra* note 2.

[4] *Id.* at 937.

reasoning in *Whalen* refutes the majority's reliance on the "voluntarily disclosed" rationale.

The *Whalen* Court stated that a public disclosure of a patient's medical information could only occur in three circumstances: (1) if a state official violated the law and deliberately or negligently disclosed the information; (2) if the state accused a doctor or patient of violating the law and offered the data as evidence in a judicial proceeding; and (3) if a doctor, pharmacist, or patient "*voluntarily reveal*[*ed*] *information on a prescription form*."[5]

Obviously, a prescription must be revealed to a pharmacist. But the Court did not consider the mere act of presenting a prescription order to a pharmacist to be a public disclosure of medical information that negates a person's expectation of privacy in the information. The Court's reasoning in *Whalen* shows that the majority opinion's reliance on the Court's earlier decision in *United States v. Miller*[6] is misplaced. The *Whalen* Court did not follow the "voluntarily disclosed" reasoning of *Miller*, and the different result reached in these decisions is not surprising. The information contained in the banking records subpoenaed in *Miller* is not comparable to the private medical information that our prescription records reveal about our physical ailments and medical decisions.

Equally important, if the plaintiff patients had no expectation of privacy in their prescription records, the Court in *Whalen* would not have decided whether the information was adequately protected. So, contrary to the majority's conclusion, federal appellate courts have specifically interpreted *Whalen* as recognizing a right of privacy in a person's prescription records and medical information.[7]

---

[5] *Whalen, supra* note 2, 429 U.S. at 600 (emphasis supplied).

[6] *United States v. Miller*, 425 U.S. 435, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976).

[7] See, *Douglas v. Dobbs*, 419 F.3d 1097 (10th Cir. 2005); *Doe v. Southeastern Penn. Transp. Auth. (SEPTA)*, 72 F.3d 1133 (3d Cir. 1995); *Murphy v. Townsend*, Nos. 98-35360, 98-35434, 98-35481, 1999 WL 439468 (9th Cir. June 22, 1999) (unpublished disposition listed in table of "Decisions Without Published Opinions" at 187 F.3d 648 (9th Cir. 1999)).

The Court stated that the remote possibility of inadequate judicial supervision of the information, if used as evidence, was not a reason for invalidating the entire program.[8] But importantly, it did not decide how state agents could obtain the evidence initially or what judicial supervision was required under the Fourth Amendment. It specifically declined to decide "any question which might be presented by the unwarranted disclosure."[9] And the facts from the lower court's decision showed only that state agents had discovered evidence of drug crimes during administrative inspections—not targeted criminal investigations.[10]

In short, *Whalen* is not persuasive authority that a state agent's subpoena of a person's prescription records for a criminal investigation does not violate the Fourth Amendment. This issue was simply not presented. The majority opinion mistakenly concludes that the Court persuasively addressed the Fourth Amendment issue in a footnote. In that footnote, the Court addressed only the plaintiffs' argument that the Fourth Amendment's protection of privacy interests from unreasonable government intrusions was a source of a general guarantee of privacy emanating from the federal Constitution.[11]

The Court's statement that the Fourth Amendment cannot be translated into a general right to privacy under the Constitution was not a new pronouncement.[12] But the Court's statement did not authorize a warrantless government intrusion into a legitimate expectation of privacy for a targeted criminal investigation. As stated, such searches are per se unreasonable.

It is true that "'[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, *either by* reference to concepts of real or personal property law or to understandings that are recognized and permitted by

---

[8] *Whalen*, *supra* note 2.

[9] *Id*., 429 U.S. at 605.

[10] See *Roe*, *supra* note 3.

[11] *Whalen*, *supra* note 2.

[12] See *Katz, supra* note 1.

society.'"[13] As the majority opinion states, "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."[14]

But the U.S. Supreme Court has rejected the majority's cheapening of nonpossessory privacy interests: "[O]nce it is recognized that the Fourth Amendment protects people—and not simply 'areas'—against unreasonable searches and seizures, it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure."[15] The Fourth Amendment's protection of legitimate nonpossessory privacy interests adds to the Amendment's baseline protections without subtracting from its protection against a physical intrusion of a constitutionally protected area.[16]

And in *Whalen*, the Court clearly recognized that individuals have a legitimate expectation of privacy in their prescription records. Other courts have also recognized this expectation, under both federal law and state law.[17] These cases strongly support the conclusion that we, as a society, consider prescription records to contain our most private and sensitive information about our physical ailments and medical decisions. To skirt this problem, the majority opinion must ignore obvious flaws in putting a targeted criminal investigation on equal footing with crimes discovered during administrative inspections, as in *Whalen*.

Obviously, many states have statutes that allow state agents to inspect a pharmacy's prescription records without a warrant.

---

[13] *United States v. Jacobsen*, 466 U.S. 109, 123 n.22, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984) (emphasis supplied).

[14] See *id.*, 466 U.S. at 113. Accord *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[15] *Katz, supra* note 1, 389 U.S. at 353.

[16] See *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013).

[17] See, *Douglas, supra* note 7; *Doe, supra* note 7; *King v. State*, 272 Ga. 788, 535 S.E.2d 492 (2000); *State v. Skinner*, 10 So. 3d 1212 (La. 2009); *State v. Bilant*, 307 Mont. 113, 36 P.3d 883 (2001); *Murphy, supra* note 7. See, also, *Doe v. Broderick*, 225 F.3d 440 (4th Cir. 2000).

These statutes exist because agency officials or law enforcement officers can conduct warrantless administrative inspections of highly regulated businesses only if the state has an authorizing statute.[18] Such inspections fall into the "special needs" exception to the warrant requirement.[19] Because businesses like pharmacies are highly regulated, the owners have a reduced expectation of the privacy in their *business* records and can be subjected to warrantless inspections.[20] But the majority opinion ignores Nebraska's statutory provisions that show the Legislature did not intend to permit administrative inspections to be used for criminal investigations.[21] And state statutes cannot define what the Fourth Amendment requires for government intrusions into private information for targeted criminal investigations.

Unlike administrative inspections of pharmacies, the Fourth Amendment's warrant and probable cause exceptions cannot apply to targeted criminal investigations into a person's prescription records. First, probable cause is not required for administrative inspections because they are "neither personal in nature nor aimed at the discovery of evidence of crime."[22] But that is obviously not true of a targeted search conducted with particularized suspicion of a crime, as in this case. And the Supreme Court has specifically held that government agents cannot use administrative inspections to search for evidence of a crime in a targeted investigation.[23] Second, the Court has

---

[18] See, *New York v. Burger*, 482 U.S. 691, 107 S. Ct. 2636, 96 L. Ed. 2d 601 (1987); *United States v. Biswell*, 406 U.S. 311, 92 S. Ct. 1593, 32 L. Ed. 2d 87 (1972); *See v. City of Seattle*, 387 U.S. 541, 87 S. Ct. 1737, 18 L. Ed. 2d 943 (1967); Annot., 53 A.L.R.4th 1168 (1987) (explaining history).

[19] See, *Burger, supra* note 18; Annot., 29 A.L.R.4th 264 (1984).

[20] See *id*.

[21] See Neb. Rev. Stat. §§ 28-428 and 81-119 (Reissue 2008).

[22] *Camara v. Municipal Court*, 387 U.S. 523, 537, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967).

[23] See, e.g., *Michigan v. Clifford*, 464 U.S. 287, 104 S. Ct. 641, 78 L. Ed. 2d 477 (1984); *Michigan v. Tyler*, 436 U.S. 499, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978); *Donovan v. Dewey*, 452 U.S. 594, 101 S. Ct. 2534, 69 L. Ed. 2d 262 (1981).

never held that because the medical industry is highly regu-
lated, patients have a reduced expectation of privacy in their
medical information held by medical institutions. To the con-
trary, it has held that the "special needs" exception applies only
if the reason for a search is divorced from the State's general
interest in law enforcement.

In *Ferguson v. Charleston*,[24] the U.S. Supreme Court
addressed the involvement of law enforcement in obtaining
medical diagnostic testing results. There, state hospital employ-
ees coordinated with law enforcement agents to develop a pro-
gram of testing urine samples of pregnant women for evidence
of cocaine use. If the urine samples tested positive for cocaine,
the hospital employees reported the women to law enforce-
ment agents, who used the information to coerce the women
into drug treatment or to charge them with drug offenses. The
Court concluded that the urine tests were searches that did not
fall into the special needs exception. It distinguished other
urine tests that it had upheld under the special needs excep-
tion. It concluded that the hospital's reporting of the testing
results to law enforcement agents specifically to incriminate
the women was a more significant privacy intrusion and was
contrary to patients' reasonable expectations of privacy in their
medical information:

> The use of an adverse test result to disqualify one from
> eligibility for a particular benefit, such as a promotion or
> an opportunity to participate in an extracurricular activity,
> involves a less serious intrusion on privacy than the unau-
> thorized dissemination of such results to third parties.
> The reasonable expectation of privacy enjoyed by the
> typical patient undergoing diagnostic tests in a hospital
> is that the results of those tests will not be shared with
> nonmedical personnel without her consent. . . . In none
> of our prior cases was there any intrusion upon that kind
> of expectation.
>
>     The critical difference between those four drug-testing
> cases and this one, however, lies in the nature of the

---

[24] *Ferguson v. Charleston*, 532 U.S. 67, 121 S. Ct. 1281, 149 L. Ed. 2d 205
(2001).

"special need" asserted as justification for the warrant-
less searches. *In each of those earlier cases, the "spe-
cial need" that was advanced as a justification for the
absence of a warrant or individualized suspicion was one
divorced from the State's general interest in law enforce-
ment*. . . . In this case, however, the central and indispens-
able feature of the policy from its inception was the use
of law enforcement to coerce the patients into substance
abuse treatment. This fact distinguishes this case from
circumstances in which physicians or psychologists, in
the course of ordinary medical procedures aimed at help-
ing the patient herself, come across information that
under the rules of law or ethics is subject to reporting
requirements . . . .[25]

I believe that the same reasoning must apply here:

If [medical] records are private, then so must be records
of prescription medications. . . . [M]edical science has
improved and specialized its medications. It is now pos-
sible from looking at an individual's prescription records
to determine that person's illnesses, or even to ascertain
such private facts as whether a woman is attempting to
conceive a child through the use of fertility drugs. This
information is precisely the sort intended to be protected
by penumbras of privacy. *See Eisenstadt v. Baird*, 405
U.S. 438, 450, 92 S.Ct. 1029, 1036, 31 L.Ed.2d 349
(1972) ("If the right to privacy means anything, it is
the right of the individual . . . to be free from unwanted
governmental intrusions into matters so fundamentally
affecting a person as the decision whether to bear or beget
a child."). An individual using prescription drugs has a
right to expect that such information will customarily
remain private.[26]

If state agents had discovered evidence of Wiedeman's
crime during a valid administrative inspection of pharmacy

---

[25] *Id*., 532 U.S. at 78-81 (emphasis supplied). See, also, *Vernonia School
Dist. 47J v. Acton*, 515 U.S. 646, 115 S. Ct. 2386, 132 L. Ed. 2d 564
(1995).

[26] *Doe, supra* note 7, 72 F.3d at 1138.

records, I would agree that she had no reason to complain.[27] But this case does not present those facts. Because law enforcement agents sought Wiedeman's records solely to incriminate her in a targeted investigation, the search was not an administrative inspection and did not fall within the special needs exception.

In short, targeted criminal investigations are distinct from other types of government searches. And once a court recognizes that citizens have legitimate expectations of privacy in their prescription records, which many courts have done, the Fourth Amendment requires probable cause and a warrant before intruding on that interest. Because I believe that Wiedeman had a legitimate expectation of privacy in her prescription records, she was entitled to challenge the search of these records without a warrant and her challenge had merit.

The Fourth Amendment does not prevent law enforcement agents from searching private information for a criminal investigation if the agents comply with its procedural protections of that information. I think most Nebraskans will be surprised to learn that by filling their prescription orders, they have publicly disclosed the medical information revealed by those orders. They likely did not suspect that a prosecutor, without any judicial oversight, could obtain their prescription records merely by issuing a subpoena. For these reasons, I cannot join the majority's opinion.

---

[27] See, *Burger, supra* note 18; *Stone v. Stow*, 64 Ohio St. 3d 156, 593 N.E.2d 294 (1992).

---

MARY KAY YOUNG, AN INDIVIDUAL, APPELLANT, V.
GOVIER & MILONE, L.L.P., ET AL., APPELLEES.
___ N.W.2d ___

Filed July 12, 2013.    No. S-11-959.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show